**The PEOPLE of the State of Colorado, Plaintiff–Appellee,**

v.

**Barry Alan EVERETT, Defendant– Appellant.**

**No. 07CA2368.**

Colorado Court of Appeals, Div. VI.

Feb. 4, 2010.

John W. Suthers, Attorney General, Jonathan P. Fero, Assistant Attorney General, Denver, Colorado, for Plaintiff–Appellee.

The Noble Law Firm, L.L.C., Antony M. Noble, Lakewood, Colorado, for Defendant–Appellant.

Opinion by Judge BERNARD.

Defendant, Barry Alan Everett, appeals the judgment of conviction entered upon a jury verdict finding him guilty of sexual assault under section 18–3–402, C.R.S.2009.

He also appeals the sentence imposed. We affirm the judgment of conviction, vacate the sentence, and we remand for resentencing with directions.

## I. Background

The victim in this case, J.H., was an eighteen-year-old woman. According to her testimony, she was in Fort Collins, drinking with friends, on a night in August 2002. While waiting for them, she asked defendant, a passerby, for a cigarette. He said that she could get one from his friend at a nearby house.

J.H. walked with defendant to a house, where they sat on the grass and talked. Defendant tried to kiss her, and she stated that she wanted to leave.

Defendant forcibly held J.H. down, despite her struggles. He choked her until she lost consciousness. When she came to, he was penetrating her.

She told him to stop and struggled against him, but he choked her again, and she passed out. When she next regained consciousness, she realized that defendant had placed her legs on his shoulders, and that he was holding her down with his weight. He continued to have forced sexual intercourse with her.

He made J.H. call him "Big Daddy" in the course of the assault; at one point, he observed that she was a virgin; and he told her that he was not going to "bust" (ejaculate) inside of her. When he concluded the attack, he whispered in her ear, "I'm sorry, I just got out of prison, I had to do this." He said his name was "Eric." Then he ran off.

At trial, in September 2007, the prosecution presented:

- J.H.'s testimony concerning the assault;
- Physical evidence, including photographs showing bruises on J.H.'s neck and jaw and scratches on her back, and J.H.'s clothing that defendant had torn in the course of the sexual assault;
- The testimony of two people who assisted J.H. after the attack, who described her disheveled appearance and her hysterical demeanor;
- The testimony of a jail inmate to whom defendant admitted the sexual assault, providing graphic details that were consistent with J.H.'s description of the crime; and
- Testimony from a forensic scientist that DNA in semen recovered from J.H. during a rape kit examination shortly after the attack matched defendant's DNA.

Relying on CRE 404(b), the prosecution also presented evidence concerning another sexual assault involving defendant that occurred in Pennsylvania. There, in 2003, defendant sneaked into an apartment where an eighteen-year-old woman, whom he had known for three days, was sleeping. The woman woke up in her bed with defendant lying next to her. Defendant climbed on top of her as she lay on her back, forcibly put her legs on his shoulders, and held her down with his weight. She resisted, and repeatedly told him to stop, but he removed her pants and penetrated her anally. When he finished attacking her, he shook her hand. Defendant had previously told this woman that his name was "Dylan."

Before trial, the prosecution argued that testimony about the Pennsylvania sexual assault was admissible under CRE 404(b) for the purposes of establishing defendant's common plan, motive, intent, and opportunity. The trial court, in an order issued in January 2007, determined that the evidence was not admissible for those purposes because it was not logically relevant. The evidence was not logically relevant because the Pennsylvania sexual assault and the sexual assault here were "dissimilar."

According to the trial court, these two incidents were dissimilar because the Pennsylvania sexual assault involved anal intercourse and this case involved vaginal intercourse; the Pennsylvania sexual assault occurred inside an apartment, while this assault occurred outside; the Pennsylvania sexual assault involved physical force, while this case involved threats and choking; and defendant remained with the victim in the Pennsylvania sexual assault, while he fled the scene immediately after the sexual assault here.

However, the trial court also expressly noted that its analysis might be different if defendant pursued a defense theory that the victim in this case had consented to have sex with him. The court reserved ruling on whether the Pennsylvania sexual assault would be admissible to rebut a defense theory of consent.

In August 2007, after defendant filed a document stating that he intended to rely on consent as a theory of defense, the prosecution filed a motion asking the trial court to reconsider its prior ruling excluding evidence of the Pennsylvania sexual assault. During the hearing on the prosecution's motion, the court recognized that the degree of similarity necessary to permit the introduction of evidence of other acts varies with the purpose for which such evidence is introduced. For example, the court noted that, to prove identity, there must be greater similarity between the charged crime and the other act, than when the other act evidence is introduced to prove intent.

Then, the trial court reconsidered its previous order, and allowed the prosecution to introduce testimony about the Pennsylvania sexual assault "to refute a defense of consent," or to prove "motive, intent, common plan, [or] modus operandi." The court stated that the testimony about the Pennsylvania sexual assault was relevant, had "significant probative value, and goes directly to the issue presented by the defense of consent, which relates directly to the defendant's motive and intent."

At trial, immediately before the victim in the Pennsylvania sexual assault testified, the trial court further limited the purposes for which her testimony could be used. The court instructed the jury that testimony about the Pennsylvania sexual assault "may be used as evidence only for the purpose of refuting the defense of consent" and the jury "should not consider it as evidence for any other purpose."

Defendant did not testify at trial. The jury convicted him of sexual assault, a class three felony. At the sentencing hearing, the trial court determined that this crime qualified as a crime of violence, and sentenced him to the statutory maximum of thirty-two years to life in prison.

## II. Pennsylvania Sexual Assault

### A. Admission of Evidence

■ Defendant contends that the trial court erred by admitting evidence of the Pennsylvania sexual assault. We disagree.

■ Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show he or she acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. CRE 404(b); *People v. Czemerynski,* 786 P.2d 1100, 1108 (Colo. 1990); *see* § 16–10–301, C.R.S.2009.

■ In evaluating the admissibility of CRE 404(b) evidence, a trial court must determine whether (1) the evidence relates to a material fact; (2) the evidence is logically relevant; (3) the logical relevance is independent of the intermediate inference, prohibited by CRE 404(b), that the defendant has a bad character; and (4) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice. *People v. Spoto,* 795 P.2d 1314, 1318 (Colo.1990).

■ Trial courts have "substantial discretion" to decide whether to admit evidence of other acts under CRE 404(b). *Masters v. People,* 58 P.3d 979, 996 (Colo.2002). We will uphold the trial court's ruling unless it was manifestly arbitrary, unreasonable, or unfair. *People v. Rath,* 44 P.3d 1033, 1043 (Colo. 2002).

■ On review, a trial court's decision to admit evidence of other acts may be supported by the court's stated rationale. It may also be defended by any ground supported by the record, even if that ground was not considered by the trial court. *People v. Quintana,* 882 P.2d 1366, 1371 (Colo.1994).

■ Further, we will not overturn a conviction because the court employed an erroneous standard in analyzing the admissibility of the other acts evidence under CRE 404(b) as long as two conditions are met. The

evidence must be admissible, and a proper foundation must have been laid to admit it. *People v. Martinez*, 36 P.3d 154, 158 (Colo. App.2001).

Here, in a written order, the trial court originally denied the prosecution's motion to admit evidence of an alleged prior sexual assault, but reserved the right to admit the evidence if defendant pursued a defense of consent. Later, defendant disclosed that he would pursue the consent defense at trial; the prosecution renewed its motion to admit the other acts evidence; and the trial court held a hearing on the matter where it admitted the evidence for the limited purpose of refuting defendant's defense of consent.

Our review of the record leads us to conclude that the trial court did not abuse its substantial discretion in admitting testimony about the Pennsylvania sexual assault because the decision to admit that evidence was not manifestly arbitrary, unreasonable, or unfair. *See Rath*, 44 P.3d at 1043–44. We further conclude that the record contains sufficient evidence to support a determination that the four *Spoto* requirements were satisfied. Even assuming that the trial court did not apply the proper legal standards, we conclude that the evidence of the Pennsylvania sexual assault was admissible, for reasons explained in more detail below, and that a proper foundation was laid to admit it. *See Quintana*, 882 P.2d at 1371; *Martinez*, 36 P.3d at 158.

The trial court was aware of the controlling legal principles, as demonstrated by its reference to *Rath* and *Spoto*. Further, the court recognized Colorado law, including section 16–10–301(3), C.R.S.2009, when it stated that the prior sexual assault (1) was relevant; and (2) had "significant probative value" because it directly addressed the issues presented by the defense theory of consent.

We next proceed to our analysis of the four *Spoto* factors. As will be described in more detail below, we conclude that:

- The testimony about the Pennsylvania sexual assault pertained to a material fact: the actus reus of the offense.
- Evidence of the Pennsylvania sexual assault was logically relevant to prove the

actus reus under a concept known as "the doctrine of chances."

- Under the doctrine of chances, the logical relevance of the evidence of the Pennsylvania sexual assault was independent of the intermediate inference that defendant had a bad character because (1) it was similar enough to the sexual assault here so as to belong to the same general category of such offenses; (2) the number of similar incidents in which defendant had been involved exceeded the frequency rate for the general population; and (3) there was a real dispute between the prosecution and the defense over whether the actus reus had occurred.
- The probative value of the evidence of the Pennsylvania sexual assault was not substantially outweighed by the danger of unfair prejudice because it did not have an undue tendency to suggest a decision on an improper basis, such as an emotional response of sympathy, hatred, or horror.

### 1. Material Fact

The evidence of the Pennsylvania sexual assault pertained to a material fact. To reach that conclusion, we analyze this issue in the context of four factors present in this case:

1.  The prosecution was required to prove, as one element of the crime of sexual assault under section 18–3–402(1)(a), C.R.S.2009, that defendant knowingly caused the victim's submission by means of sufficient consequence reasonably calculated to cause her submission against her will.

2.  The court submitted a special interrogatory to the jury, which asked the jury to determine whether the prosecution had proved that defendant caused the victim's submission through the actual application of physical force or physical violence. Under section 18–3–402(4)(a), C.R.S.2009, this finding resulted in the conviction being classified as a class three felony. *See* § 18–3–402(2), (4), C.R.S.2009.

3.  Defendant's theory of defense was that the sexual intercourse was consensual.

4. The jury instructions defined "consent" to mean

cooperation in act or attitude pursuant to an exercise of free will and with knowledge of the nature of the act.... Submission under the influence of fear shall not constitute consent. Assent does not constitute consent if it is ... induced by force [or] duress....

In light of the definition of "consent" submitted to the jury, the defense theory that J.H. consented to have sexual intercourse with defendant contested an essential element of the offense: whether he caused her submission by means of sufficient consequence reasonably calculated to cause her submission against her will. Defendant's defense theory likewise contested the issue raised in the special interrogatory: whether he caused her submission through the actual application of physical force or physical violence.

By employing this defense theory, defendant asserted that J.H. was lying when she testified that defendant had sexual intercourse with her against her will. This theory was a contention that part of the actus reus of the offense of sexual assault did not occur.

This is so because the two methods of causing a victim's submission at issue in this case

by [their] very nature negate[ ] the existence of [a] victim's consent. The [sexual assault] statute equates the victim's non-consent with proof that the defendant has caused the victim's submission by force, [or] by threat either of great harm or of retaliation.... These acts of the defendant cause the victim to be unable to consent.

*Dunton v. People*, 898 P.2d 571, 573 (Colo. 1995) (citation omitted); *see also People v. Smith*, 638 P.2d 1, 4 n. 5 (Colo.1981)(the phrase "cause submission" implies that the victim does not consent to sexual relations; common law rape and its statutory counterparts make lack of consent essential to the offense); 4 William Blackstone, *Commentaries on the Laws of England* 210 (1769) (rape was defined at common law as "the carnal knowledge of a woman forcibly and against her will"); Meredith J. Duncan, *Sex Crimes and Sexual Miscues: The Need for a Clearer Line Between Forcible Rape and Nonconsensual Sex*, 42 Wake Forest L.Rev. 1087, 1093 (Winter 2007) (the actus reus of common law rape consisted of sexual intercourse with the victim, without her consent, by force or threat of force); Kit Kinports, *Rape and Force: the Forgotten Mens Rea*, 4 Buff.Crim. L.Rev. 755, 759 (2001)(the two components of the actus reus of rape are force and the absence of consent); Joshua Dressler, *Where We Have Been, and Where We Might Be Going: Some Cautionary Reflections on Rape Law Reform*, 46 Clev. St. L.Rev. 409, 424 (1998) (lack of consent is an element of the actus reus—"indeed, the essence"—of rape).

■ In order to convict, a jury must be satisfied, beyond a reasonable doubt, that the prosecution has proved that the victim did not consent to having sex with the defendant. *People v. Cruz*, 923 P.2d 311, 312 (Colo.App. 1996). However, based on the methods of causing submission contained in the statute that are relevant here, this requirement did not also mandate that the prosecution prove that defendant was aware that J.H. did not consent. *See Dunton*, 898 P.2d at 573.

■ Whether the actus reus occurred is obviously a material fact. *See People v. Cousins*, 181 P.3d 365, 370–71 (Colo.App. 2007). Because the defendant's use of force or threats is an element of the crime of sexual assault, and because such conduct is relevant to prove that the victim did not consent, evidence of other acts that is "offered to prove the defendant's actions at the time of the sexual encounter relates to a genuinely disputed material fact." Mark Cammack, *Using the Doctrine of Chances to Prove Actus Reus in Child Abuse and Acquaintance Rape: People v. Ewoldt Reconsidered*, 29 U.C. Davis L.Rev. 355, 395 (Winter 1996); *see also People v. McKibben*, 862 P.2d 991, 992–94 (Colo.App.1993)(the theory of defense that the victim did not consent to a sexual act raises an issue of material fact). Thus, "[e]vidence of other acts is admissible to prove [that] the act prohibited by law was committed." *Cousins*, 181 P.3d at 370.

We recognize that another division of this court has indicated that consent in a sexual

assault case is an issue of mens rea. *See Martinez*, 36 P.3d at 159 (stating that intent is the "other side of the coin" of consent). Because we respectfully disagree with this statement in *Martinez* for the reasons stated above, we decline to follow it on this issue. *See People v. Thomas*, 195 P.3d 1162, 1164 (Colo.App.2008)(one division of the court of appeals is not bound by opinions from other divisions). As we discuss below, our conclusion that the defense theory of consent concerns the material fact of the actus reus of sexual assault shapes how the doctrine of chances applies to this case.

### 2.  Logical Relevance

Evidence of the Pennsylvania sexual assault was logically relevant to the consent defense under a concept known as "the doctrine of chances." The doctrine of chances is based on the instinctive logical process that reasonably determines that unusual and abnormal events are unlikely to recur by chance. 2 John Wigmore, *Evidence in Trials at Common Law* § 302, at 241 (Chadbourn rev.1979). One well-known formulation of this doctrine, used in a different context, describes how it works:

> [I]f A while hunting with B hears the bullet from B's gun whistling past his head, he is willing to accept B's bad aim ... as a conceivable explanation; but if shortly afterwards the same thing happens again, and if on the third occasion A receives B's bullet in his body, the immediate inference (i.e., as a probability, perhaps not a certainty) is that B shot at A deliberately; because the chances of an inadvertent shooting on three successive similar occasions are extremely small.

*Id.* To describe the doctrine more colloquially, "[t]he man who wins the lottery once is envied; the one who wins it twice is investigated." *United States v. York*, 933 F.2d 1343, 1350 (7th Cir.1991), overruled on other grounds by *Wilson v. Williams*, 182 F.3d 562, 567 (7th Cir.1999).

Courts, including our supreme court, have recognized that the doctrine of chances may justify the introduction of evidence of other acts in appropriate circumstances. *Spoto*, 795 P.2d at 1319–20; *see generally Wynn v.*

*State*, 351 Md. 307, 345, 718 A.2d 588, 607 (1998) (Raker, J., dissenting) (listing cases in which appellate courts have used the doctrine of chances to analyze the admissibility of evidence of other acts).

The doctrine of chances can be used to prove the actus reus of a crime. Edward J. Imwinkelried, *The Use of Evidence of an Accused's Uncharged Misconduct to Prove Mens Rea: The Doctrines Which Threaten to Engulf the Character Evidence Prohibition*, 51 Ohio St. L.J. 575, 586–93 (1990) (discussing use of the doctrine to prove the actus reus); *see also Rath*, 44 P.3d at 1042 ("Other-crimes evidence demonstrating a common design or modus operandi has been admitted in prosecutions for sexual assault not only to prove who committed the crime but also to prove that the alleged sex act actually occurred.").

The need for evidence based on the doctrine of chances can be particularly important in sexual assault cases:

> Sex crimes, more than others, tend to be committed in private. Usually, the only witnesses are the complaining witness and the accused. Often the victim testifies the defendant raped her, and the defendant testifies she is lying. Often, there is no physical evidence, especially when, as here, the defendant admits the intercourse but claims consent. In that situation, who should be believed? This can present difficult credibility questions for the jury, especially if there is no evidence corroborating either version. It is therefore particularly important that when corroborating evidence *does* exist, the jury be allowed to consider it.

*People v. Balcom*, 7 Cal.4th 414, 428, 27 Cal.Rptr.2d 666, 867 P.2d 777, 785 (1994) (Arabian, J., concurring) (emphasis in original); *see also Martin v. State*, 173 S.W.3d 463, 465–68 (Tex.Crim.App.2005) (evidence of another sexual assault was admissible under the doctrine of chances to prove victim did not consent); *State v. Hill*, 104 Ariz. 238, 239, 450 P.2d 696, 697 (1969)(evidence of a prior sexual assault was "extremely relevant and indeed vital proof of ... forcible rape"); *but see Lovely v. United States*, 169 F.2d 386, 390 (4th Cir.1948) (fact that one woman was

raped has no tendency to prove that another did not consent); *Brown v. State,* 459 N.E.2d 376, 379 (Ind.1984)(same).

Our General Assembly made a similar statement by enacting section 16–10–301(1), C.R.S.2009. There, the legislature declared that sexual assault is a profoundly harmful crime that is often not reported for a variety of reasons; sexual assault is often only witnessed by the victim and the perpetrator; perpetrators often commit multiple offenses with different victims; and these assaults often, although not always, involve "similar methods or ... common design." The legislature also stated that evidence of other sexual assaults can be used to prove the "corpus delecti" of charged sexual assaults. *Id.; see also People v. Opson,* 632 P.2d 602, 604–05 (Colo.App.1980)(other acts evidence is more readily available in sexual assault cases).

In sexual assault cases in which the defendant claims that the victim consented, the doctrine of chances serves as a proper rationale to admit evidence of other sexual offenses because

> [w]hen one person claims rape, the unusual and abnormal element of lying by the complaining witness may be present. But, when two (or more) persons tell similar stories, the chances are reduced that both are lying or that one is telling the truth and the other is coincidentally telling a similar false story.

*Balcom,* 7 Cal.4th at 430, 27 Cal.Rptr.2d 666, 867 P.2d at 787 (Arabian, J., concurring); *see also Cammack,* 29 U.C. Davis L.Rev. at 393 (use of the doctrine of chances in acquaintance rape cases "relies on the improbability that one individual would be the object of repeated false accusations").

Section 16–10–301(3) also recognizes that evidence of other acts is relevant to the issue whether the victim consented to engage in sexual acts with the defendant. It states:

> The prosecution may introduce evidence of other acts of the defendant to prove the commission of the offense as charged for any purpose other than propensity, including: [r]efuting defenses, such as consent or recent fabrication....

### 3. Independence of Logical Relevance from Inference of Bad Character

■■■ "Evidence of prior acts is inadmissible 'if the logical relevance of the proffered evidence depends upon an inference that a person who has engaged in such misconduct has a bad character and the further inference that the defendant therefore engaged in the wrongful conduct at issue.' " *Yusem v. People,* 210 P.3d 458, 466 (Colo.2009)(quoting *Spoto,* 795 P.2d at 1318).

Our supreme court has recognized, however, that almost any evidence of other crimes will suggest that the defendant has a bad character and acted consistently with that character. *See People v. Snyder,* 874 P.2d 1076, 1080 (Colo.1994). The key to understanding the third *Spoto* step is that it "does not demand the absence of the inference but merely requires that the proffered evidence be logically relevant independent of that inference." *Id.; see also People v. Leonard,* 872 P.2d 1325, 1328 (Colo.App.1993).

The chain of reasoning barred by *Spoto* occurs when the evidence of other acts leads to the intermediate inference that the accused has a bad character, which, in turn, leads to the ultimate inference that the accused's charged conduct was in conformity with his or her bad character. Imwinkelried, 51 Ohio St. L.J. at 576.

■■ However, the use of the doctrine of chances creates reasoning that is independent of the intermediate inference of the defendant's bad character: the evidence of other acts leads to the intermediate inference that it is objectively improbable that the accused would be involved in multiple unusual events, which, in turn, leads to the ultimate inference that the accused committed the actus reus of the charged crime. *Id.* at 589.

Here, the permissible chain of reasoning is as follows: the evidence of the Pennsylvania sexual assault leads to the intermediate inference that it is objectively improbable that two women would say that they had been sexually assaulted by defendant and give similar descriptions of the circumstances. The fact that the first woman described similar events makes it more likely that the

second woman's description is truthful. This permissible intermediate inference does not arise from a judgment regarding defendant's character, and leads, in turn, to the ultimate inference that defendant caused (1) the victim's submission by means of sufficient consequence reasonably calculated to cause her to submit against her will; and (2) the victim's submission through the actual application of physical force or physical violence.

At least one commentator, Professor Edward Imwinkelried, urges courts to be cautious when deciding whether to allow the prosecution to introduce evidence of other acts and rely on the doctrine of chances to prove the actus reus. This is so because "[i]f uncharged misconduct becomes routinely admissible to prove the actus reus, there will be little left to the prohibition" that such evidence cannot be used to prove that a defendant acted in conformity with his or her character. *Id.* at 588.

To protect against the exception swallowing the rule, Professor Imwinkelried recommends that the trial court determine whether the prosecution has satisfied three criteria. First, is the evidence of other acts roughly similar to the charged crime? Second, does the number of unusual occurrences in which the defendant has been involved exceed the frequency rate for the general population? Third, is there a real dispute between the prosecution and the defense over whether the actus reus occurred? *Id.* at 589–93.

We agree with Professor Imwinkelried that these criteria are important conditions that should be met when other acts are used to prove the actus reus by way of the doctrine of chances. Thus, we apply them here, and we conclude that they were satisfied.

#### a. Similarity

Although the trial court initially determined that the two incidents were not sufficiently similar to support the introduction of testimony about the Pennsylvania assault, the court reversed course when defendant indicated that his theory of defense would be that J.H. consented to have sex with him. As part of this reconsideration, the court recognized that the necessary degree of similarity between a charged offense and another

act depends upon the purpose for which evidence of the other act is offered.

Although the incidents must be somewhat similar to be admissible under the doctrine of chances to prove the actus reus, the degree of similarity need not be as great as when other reasoning is employed, such as using the doctrine of chances to prove the identity of a perpetrator via modus operandi. Rather, "it suffices that all the incidents fall into the same general category." Imwinkelried, 51 Ohio St. L.J. at 576; *see also Rath*, 44 P.3d at 1042 n. 7 (using the modus operandi theory to identify defendant as the perpetrator requires the highest degree of similarity between the uncharged act and the charged crime; employing the doctrine of chances to prove actus reus requires less).

Here, although the incidents were not identical, there were important and significant similarities between them that lead us to conclude that they fell into "the same general category." *See* Imwinkelried, 51 Ohio St. L.J. at 576. Both incidents involved eighteen-year-old females. Both incidents involved defendant putting the victims' legs over his shoulders and thus pinning them down with the weight of his body. Both incidents involved victims who struggled and repeatedly told defendant to stop. Both incidents involved conciliatory gestures to the victims at the end of the assaults. Defendant used a false first name when identifying himself to each victim. *See id.*

Further, the two sexual assaults were separated by half the North American continent. There is no indication that the two victims knew each other, or that they ever discussed the details of the respective sexual assaults.

#### b. Number of Unusual Occurrences

The nature of the two unusual incidents here indicates that the number in which defendant has been involved exceeds the frequency rate for the general population. Common human experience teaches that it is unusual for a person to be falsely accused of committing sexual assault, and that two unrelated, similar accusations would be well beyond the experience of the typical man. *See id.* at 591 ("[E]very jurisdiction allows the

judge to rely on common sense and experience to make [such] decision[s].").  "The improbability that the same innocent person will be repeatedly accused of committing crimes raises an inference that he did commit the crimes."  Cammack, 29 U.C. Davis L.Rev. at 404; *see also People v. Vander-Vliet*, 444 Mich. 52, 81, 508 N.W.2d 114, 129 n. 35 (1993) ("On the basis of the defendant's allegation that John J was one of twenty-five or thirty clients that defendant supervised at one time, we can intuitively conclude that it is objectively improbable that three out of thirty clients would coincidentally accuse defendant of sexual misconduct." (citation omitted)), *amended on other grounds*, 445 Mich. 1205, 520 N.W.2d 338 (1994); *State v. Craig*, 219 Neb. 70, 75–76, 361 N.W.2d 206, 212 (1985) (same); Cammack, 29 U.C. Davis L.Rev. at 399 ("Even without assuming that people tend to behave consistently [with their characters], we could infer from the fact that two people have both accused the defendant of the same thing that the defendant caused the accusations by his conduct.").

Based on this reasoning, the fact that the prosecution only offered evidence of one prior act, as opposed to two or more, did not render evidence of the Pennsylvania sexual assault inadmissible.  We are aware that our supreme court indicated in *Spoto* that, under the facts of that case, evidence of a single prior incident should not have been admitted at trial.

The prior incident in *Spoto* involved the defendant pointing an unloaded gun at a man.  The defendant was subsequently charged with shooting another man and murdering him.  In the murder case, the trial court allowed the prosecution to introduce evidence of the prior incident to rebut the defendant's arguments that he acted in self-defense in pointing the gun at the murder victim, and that, in a resulting struggle, the gun fired accidentally.  *Spoto*, 795 P.2d at 1315–17.

In concluding that Spoto's murder conviction should be reversed, the supreme court observed that, when employing the doctrine of chances as the theory of logical relevance, "similarity is crucial."  *Id.* at 1320.  The supreme court also noted that, under the

doctrine of chances, "[t]he greater the number of instances, the less likely it is that they are accidental."  *Id.* Because the prosecution only sought to introduce one prior incident, it had "little probative value."  *Id.*

However, the supreme court also made clear that it was not the "small probative value" of a single prior incident that rendered the evidence inadmissible.  *Id.* Rather, it was the *combination* of a single prior incident with the lack of similarity that undercut the logical relevance of the prior incident. *Id.*

Here, we have concluded that the Pennsylvania sexual assault is sufficiently similar to fall into the "same general category" as this case.  Thus, we are not faced with the combination of factors that led the supreme court in *Spoto* to conclude that evidence of the prior incident was not logically relevant under the doctrine of chances.

In assessing whether to admit evidence of a single prior incident under the doctrine of chances, we turn for guidance to the Oregon Supreme Court's decision in *State v. Johns*, 301 Or. 535, 554–55, 725 P.2d 312, 324 (1986):

> Is one prior similar incident enough to justify admission ... ?
>
> . . . .
>
> We believe no categorical statement can be made one way or the other.  Depending upon the circumstances of the case, sometimes one prior similar act will be sufficiently relevant for admissibility and sometimes not.  A simple, unremarkable single instance of prior conduct probably will not qualify, but a complex act requiring several steps, particularly premeditated, may well qualify.  These decisions must be made case-by-case.

Here, there was sufficient similarity between the two incidents to justify our conclusion that the probability that defendant sexually assaulted J.H. was made more likely by the evidence of the Pennsylvania sexual assault because

> [e]vidence that another woman from a distant state who, so far as appears in the [record], neither knew nor knew of the complainant, accused the defendant of raping her in a manner similar to the charged

offense, thoroughly discredits the defendant's claim that the victim fabricated her allegation of forced sex.

Cammack, 29 U.C. Davis L.Rev. at 409; *see also* 1 Edward J. Imwinkelried, *Uncharged Misconduct Evidence* § 4:3, at 4–46 (2009) (relying on his or her life experiences, judge should admit evidence of another similar incident when the occurrence of the charged incident is a "once in a lifetime" event, because "[c]oupled with the charged incident, the uncharged misconduct evidence will show that the defendant has encountered such incidents with extraordinary frequency"); *id.* § 5:7, at 5–22 to –23 ("[I]n analyzing the applicability of the doctrine of chances, it seems wrong-minded to focus on the absolute number of incidents. Rather, the focus should be on relative frequency.").

Therefore, we conclude that the similarity of the Pennsylvania sexual assault to this case, and the relative frequency of two women separated by great geographical distance describing similar incidents, were sufficient to justify admitting the evidence of a single prior incident because it was logically relevant under the doctrine of chances.

### c. Real Dispute over Actus Reus

There was a real dispute between the prosecution and the defense over whether the actus reus occurred. J.H. claimed that she had been forcibly raped. Defendant responded that J.H. had consented, and then falsely accused him of sexual assault to avoid difficulties with her boyfriend. Thus, because the focus of the defense theory was on J.H.'s credibility, the prosecution had a legitimate need for evidence of the Pennsylvania sexual assault to prove the actus reus.

Further, the legislature has indicated that in

the prosecution of sexual offenses, including in proving the corpus delicti of such offenses, there is a greater need and propriety for consideration by the fact finder of evidence of other relevant acts of the accused, including any ... crimes ..., whether isolated acts or ongoing actions and whether occurring prior to or after the charged offense.

§ 16–10–301(1). Thus, the legislature has expressed its policy judgment that evidence of additional sexual misconduct should be more readily available in sexual assault cases. *See People v. Larson,* 97 P.3d 246, 249 (Colo.App. 2004).

### 4. CRE 403

■ We conclude that the evidence of the Pennsylvania sexual assault also satisfied the fourth prong of the *Spoto* test because the probative value of that evidence was not substantially outweighed by the danger of unfair prejudice.

We begin this portion of our analysis by assuming the maximum probative value a reasonable fact finder might give the evidence of the Pennsylvania sexual assault and the minimum unfair prejudice to be reasonably expected from its introduction. *Id.* This is because the balance inherent in the analysis under CRE 403 favors the admission of evidence. *Rath,* 44 P.3d at 1033. The legislature has emphasized this point, finding that

evidence of other sexual acts is typically relevant and highly probative, and it is expected that normally the probative value of such evidence will outweigh any danger of unfair prejudice, even when incidents are remote from one another in time.

§ 16–10–301(1).

For the purposes of the fourth *Spoto* prong, unfair prejudice only pertains to "an undue tendency on the part of admissible evidence to suggest a decision made on an improper basis." *People v. Gibbens,* 905 P.2d 604, 608 (Colo.1995)(quoting *People v. District Court,* 869 P.2d 1281, 1286 (Colo. 1994)). An improper basis is "commonly but not necessarily an emotional one, such as sympathy, hatred, contempt, retribution, or horror." *People v. District Court,* 785 P.2d 141, 147 (Colo.1990). Unfair prejudice does not include any prejudice that flows from the evidence's legitimate probative force. *Gibbens,* 905 P.2d at 608.

Here, the evidence of the Pennsylvania sexual assault added substantial weight to the prosecution's proof of the actus reus. It directly addressed defendant's theory that J.H. consented to sexual intercourse, and

that she then fabricated the sexual assault in order to avoid trouble with her boyfriend.

Defendant's argument was based on evidence in the record such as (1) J.H.'s testimony that she had an argument with her boyfriend earlier in the evening; (2) her admission that she had been drinking before she encountered defendant; (3) inconsistencies between her trial testimony and what she told the police about the sexual assault; and (4) inconsistencies between her testimony and the testimony of other witnesses.

Although there was other evidence that indicated that J.H. did not consent, such as her torn clothing, or the inmate's testimony, the evidence concerning the Pennsylvania sexual assault supported an inference that J.H. was truthful when she said she did not consent. It added significant probative value, fueled by a proper application of the doctrine of chances, beyond the evidence otherwise available to the prosecution. *See Rath,* 44 P.3d at 1041.

We conclude that the record establishes that the additional probative value of the evidence of the Pennsylvania sexual assault was not substantially outweighed by the danger of unfair prejudice under CRE 403. As noted above, the Pennsylvania sexual assault was similar, in important respects, to the charged offense. The evidence had legitimate probative force. The trial court evaluated the admissibility of the Pennsylvania sexual assault twice. It referred to controlling law, including *Rath.* It only allowed the evidence of the Pennsylvania sexual assault to be introduced for a single purpose, rejecting several other purposes proposed by the prosecution. Thus, any risk that this evidence had an undue tendency to suggest a decision on an improper basis, such as an emotional response of sympathy, hatred, or horror, was appropriately mitigated. *See Rath,* 44 P.3d at 1043–44; *District Court,* 785 P.2d at 147.

### B. Limiting Instruction

Defendant contends that the trial court erred because it did not provide an appropriate limiting instruction concerning the proper uses of the evidence of the Pennsylvania sexual assault in the final jury instructions. We agree the trial court erred, but we conclude that reversal is not required.

Defense counsel did not object to the trial court's failure to give a proper limiting instruction. Therefore, we review for plain error, meaning error that is obvious and substantial, and that seriously affects substantial rights of the accused. *People v. Roberts,* 738 P.2d 380, 382 (Colo.App.1986). Under this standard, reversal is limited to those circumstances in which an appellate court, after reviewing the entire record, can say with fair assurance that the error so undermined the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the judgment of conviction. *People v. Bowers,* 801 P.2d 511, 519 (Colo. 1990).

Section 16–10–301(4)(d), C.R.S.2009, provides that trial courts "shall, at the time of the reception into evidence of other acts and again in the general charge to the jury, direct the jury as to the limited purpose ... for which the evidence is admitted." *See also Opson,* 632 P.2d at 605 (noting that section 16–10–301 mandates limiting instructions). Nevertheless, no rule exists requiring automatic reversal when a trial court fails to comply with the limiting instructions requirement of section 16–10–301(4)(d). *People v. Underwood,* 53 P.3d 765, 772 (Colo.App. 2002).

In *Underwood,* a division of this court found no plain error where a trial court failed to provide a contemporaneous limiting instruction for other acts evidence introduced against the defendant in a trial for aggravated incest and sexual assault on a child. *Id.* at 773. The division reasoned that (1) the other acts evidence was relatively minor compared to all the other evidence implicating the defendant; (2) only two lay witnesses briefly testified to the other acts, and only one of those witnesses claimed personal knowledge; and (3) the trial court's final charge to the jury "substantially tracked" the pattern jury instruction on similar transaction evidence, *see* CJI–Crim. 4:02 (1983), referred to an earlier other acts limiting instruction, and instructed the jury that the "defendant cannot be tried or convicted of

any act not charged in the information." *Underwood,* 53 P.3d at 771–73.

Here, before the jury heard the other acts evidence, the trial court provided a limiting instruction that specified that the jury could consider the other acts evidence for just one purpose: to refute the defense of consent. However, in its final instructions given before closing arguments, the trial court instructed the jury that other acts evidence had been admitted and could only be considered for one purpose, but it did not restate that purpose.

Hence, the trial court violated section 16–10–301(4)(d) when it failed to include in the final jury instructions the specific purpose for which the other act evidence was admitted. However, we conclude that this omission was not plain error because it was not substantial; it did not affect defendant's substantial rights; and we cannot say, with any assurance, that the error undermined the trial's fundamental fairness to a degree that we have serious doubts about the conviction's reliability.

We reach this conclusion because the jury was given a proper initial limiting instruction when the evidence of the Pennsylvania sexual assault was first admitted. Further, the final limiting instruction reminded the jury of the initial limiting instruction, which specifically restricted the use of the evidence of the Pennsylvania sexual assault to the issue of consent. Although the final charge was technically deficient, it tracked and referred to the original limiting instruction, stating that the jury "cannot consider evidence admitted for a limited purpose except for the limited purpose for which it was admitted."

We recognize that, in *Roberts,* 738 P.2d at 382, a division of this court found plain error because the trial court failed to give *any* limiting instruction in an incest trial. *Roberts* is distinguishable from this case. In *Roberts,* there was no limiting instruction at all; here, there were two, although one was partially flawed. Thus, because of this difference, we conclude that *Underwood's* reasoning is far more pertinent to defendant's case than *Roberts's.*

### III. Motion for Mistrial

Defendant asserts that the prosecution violated his right to a fair trial by eliciting evidence that he had been incarcerated, and that the trial court abused its discretion by refusing to grant a mistrial based on that testimony. We disagree.

A mistrial is a drastic remedy, *People v. Griffin,* 985 P.2d 15, 21 (Colo.App. 1998), and our supreme court has made clear that a trial court's decision whether to grant a mistrial will not be disturbed absent an abuse of discretion, *People v. Vigil,* 718 P.2d 496, 505 (Colo.1986). "Where inadmissible evidence of other crimes is brought to the attention of the jury, the factors relevant to the exercise of discretion to declare a mistrial include the nature of the inadmissible evidence, the weight of admissible evidence of guilt, and the value of a cautionary instruction." *Id.*

Referring to "an accused's incarceration is not necessarily so prejudicial as to require a new trial." *Griffin,* 985 P.2d at 21; *see also People v. Lowe,* 184 Colo. 182, 189, 519 P.2d 344, 347–48 (1974). The prejudicial effect of a mere "fleeting and ambiguous" reference to inadmissible evidence of the defendant's criminality, as opposed to a more direct reference, is harder to determine. *See Vigil,* 718 P.2d at 505. Similarly, substantial evidence of a defendant's guilt means a jury is less likely to reach a guilty verdict based on an inadmissible reference to the defendant's criminality. *Id.* at 506.

A motion for a mistrial is more likely to be granted where the prosecutor intentionally elicited improper character evidence. *Compare People v. Goldsberry,* 181 Colo. 406, 411, 509 P.2d 801, 804 (1973) (citing the intentional nature of the prosecutor's elicitation of improper character evidence as a factor in determining that a mistrial was required), *with Lowe,* 184 Colo. at 188–89, 519 P.2d at 347–48 (affirming denial of mistrial where reference to incarceration on another charge was inadvertent).

Finally, a trial court may issue a curative instruction to correct an error in exposing the jury to inadmissible evidence.

*Goldsberry,* 181 Colo. at 410, 509 P.2d at 803. However, no curative instruction suffices when inadmissible evidence "is so highly prejudicial . . . it is conceivable that but for its exposure, the jury may not have found the defendant guilty." *Id.*

Here, at the conclusion of a hearing held outside the jury's presence, the trial court ruled that the inmate would not be allowed to testify that his conversation with defendant about a sexual assault had occurred in a jail. The court determined that such testimony about the location of the conversation would be unduly prejudicial.

During the inmate's cross-examination, defense counsel asked a series of questions designed to show that the inmate was lying in order to gain favorable treatment from the prosecution or the police. As part of this line of inquiry, defense counsel asked the inmate whether he had previously contacted the prosecution in order to provide information in another case.

On redirect examination, the prosecutor asked the inmate several questions concerning whether he had received any benefit from providing information to the prosecution. After the inmate denied that he had, the prosecutor delved into difficulties the inmate had contacting the prosecution, asking whether this trouble arose because the prosecution "just [does not] take collect calls from the jail."

Defense counsel objected. The trial court instructed the jury to disregard the question, and to give it no probative weight. The court also denied defendant's motion for a mistrial, relying upon the court's immediate curative instruction; and, because the objection was lodged before the question was answered, the jury was not provided with definitive evidence that defendant was in jail with the inmate when defendant admitted sexually assaulting J.H.

Applying the principles governing mistrials discussed above, our review of the record leads us to conclude that the trial court did not abuse its discretion when it denied defendant's mistrial request. We base this conclusion on several factors.

First, it requires speculation to conclude that the prosecutor's question prejudiced defendant. The reference in the question to the inmate's incarceration was fleeting and ambiguous. The question was never answered. Because the question referred to another case, it did not ineluctably lead to the inference that defendant was incarcerated when he admitted the sexual assault. The trial court promptly responded by sustaining defense counsel's objection and instructing the jury to disregard the question.

Second, the prosecutor stated that the reference to the inmate's incarceration in the question was a mistake, as opposed to an intentional circumvention of the trial court's order. The trial court found that the question was an inadvertent, as opposed to a calculated, violation of the court's order, and the record supports this finding.

Third, as summarized above, there was substantial evidence of defendant's guilt.

Fourth, based on the previous three factors, we conclude that this single reference to the inmate's incarceration was not so highly prejudicial that it is conceivable that the jury may have acquitted defendant had it not heard this question.

### IV. Sentencing

#### A. Crime of Violence

■ The Attorney General agrees with defendant's argument that the trial court erred by sentencing him for committing a crime of violence. We also agree, vacate the sentence, and remand for a new sentencing hearing.

■ Defendant may challenge the legality of his sentence. A sentence is illegal if it does not fully comply with statutory requirements, *Delgado v. People,* 105 P.3d 634, 636 (Colo.2005), and an illegal sentence may be corrected at any time, *see Craig v. People,* 986 P.2d 951, 966 (Colo.1999). We review de novo whether the trial court correctly determined the sentencing range. *People v. Montalvo–Lopez,* 215 P.3d 1139, 1146 (Colo.App. 2008) (*cert. granted* Oct. 6, 2008).

The jury convicted defendant of the class three felony of sexual assault in violation of

section 18–3–402(1) and (4)(a). However, these subsections do not establish per se crimes of violence in this case because J.H. was not less than fifteen years of age at the time of the offense. *See* § 18–1.3–406(2)(b)(I), C.R.S.2009. Further, the prosecution did not allege in a separate count that defendant had committed a crime of violence. *See* § 18–1.3–406(2)(a)(II)(E), C.R.S.2009; *People v. Santana–Medrano,* 165 P.3d 804, 808 (Colo.App.2006) (requiring prosecution to plead and prove a separate count where underlying crime is not a per se crime of violence).

The presumptive range sentence for a class three sexual assault is between four years and twelve years to life in prison. §§ 18–1.3–401(1)(a)(V)(A), 18–1.3–1004(1)(a), C.R.S.2009. In the absence of a crime of violence, if aggravating circumstances are present, the maximum sentence for this offense is twenty-four years to life in prison. §§ 18–1.3–401(6), 18–1.3–1004(1)(a), C.R.S. 2009.

Here, the trial court classified defendant's offense as a crime of violence and sentenced him to thirty-two years to life in prison. However, because it was not a crime of violence, we vacate defendant's sentence and remand for a new hearing at which the trial court will impose sentence for a class three felony sexual assault that is not a crime of violence.

### B. Lack of Remorse

We last address defendant's argument that the trial court violated his constitutional privilege against self-incrimination when, during sentencing, it considered his lack of remorse as an aggravating factor. Although we vacate defendant's sentence, we discuss this issue because it is likely to arise on remand. *See People v. McCann,* 122 P.3d 1085, 1088 (Colo.App.2005).

When a defendant maintains his or her constitutional right to remain silent throughout trial and the sentencing hearing, the court cannot construe this silence to indicate a lack of remorse that will support a sentence in the aggravated range. *People v. Baker,* 178 P.3d 1225, 1234 (Colo.App.2007);

*People v. Young,* 987 P.2d 889, 894 (Colo. App.1999). However, a defendant who testifies at trial or at the sentencing hearing waives his or her constitutional right to remain silent, and a court can consider what he or she says, or does not say, for purposes of sentencing, including whether the defendant has expressed remorse. *Baker,* 178 P.3d at 1234.

Therefore, on remand, the trial court may not use defendant's silence during his trial or the sentencing proceedings to enhance his sentence. However, the trial court may rely on any evidence in the record to justify a finding that defendant lacked remorse, including defendant's statements to witnesses, and the letter defendant wrote to the trial court on October 25, 2007, which describes his reasons for not complying with the court's order for a presentence investigation.

The judgment of conviction is affirmed. The sentence is vacated, and the case is remanded to the trial court for resentencing consistent with this opinion.

Judge CARPARELLI and Judge LOEB concur.