948 A.2d 752

PENNSYLVANIA DEPARTMENT OF BANKING, Appellee

v.

NCAS OF DELAWARE, LLC, d/b/a Advance America
Cash Advance Centers, Appellant.

Supreme Court of Pennsylvania.

Submitted on Briefs March 20, 2008.

Decided May 29, 2008.

Kerry Elizabeth Smith, Community Legal Services, for Community Legal Services, amicus curiae.

Irwin William Aronson, Willig, Williams & Davidson, Philadelphia, for PA AFL–CIO, amicus curiae.

Mark Jay Levin, Arthur Makadon, Jeremy Rosenblum, Alan S. Kaplinsky, Ballard Spahr Andrews & Ingersoll, L.L.P., Philadelphia, for NCAS of Delaware, LLC, appellant.

Robert L. Byer, John Jeming Soroko, Duane Morris, L.L.P., Philadelphia, for Pennsylvania Dept. of Banking, appellee.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD and McCAFFERY, JJ.

## OPINION

Justice SAYLOR.

This direct appeal involves primarily the question of whether, by charging certain fees and interest as a "payday lender," the appellant violated the Consumer Discount Company Act.

NCAS of Delaware, LLC ("Appellant") is a Delaware limited liability company doing business as Advance America, Cash Advance Center, a payday cash lender with approximately 100 locations in the Commonwealth. Payday loans are short-term, high-interest-or-fee loans that are generally secured by a post-dated check or a debit authorization executed by the borrower and, subsequently, presented by the lender after a predetermined period, usually set at two weeks to coincide with the borrower's payday.[1] *Accord* NCAS Revolving Credit Agreement, R.R. at 182a ¶ 2 ("The monthly cost of your account is extremely high compared to other forms of credit that you may be able to obtain."). *See generally Smith v. Steinkamp*, 318 F.3d 775, 775–76 (7th Cir.2003) ("A payday loan is a loan of short duration, typically two weeks, at an astronomical annual interest rate[.]").

In June 2006, Appellant began offering in Pennsylvania a "Choice Line of Credit" in which a $500 credit line was provided to qualifying borrowers at a simple daily periodic interest rate corresponding with an annual percentage rate

---

1. This is consistent with the Department of Banking and the *amici's* description of payday loans. *See* Complaint, R.R. at 55a, ¶ 6; *Amici,* Community Legal Services and The Pennsylvania AFL–CIO, Brief in support of Appellee at 2–4. Appellant characterized the Department's definition as an abstract legal conclusion, which it denied to the extent required, *see* NCAS's Answer & New Matter, R.R. at 63a, ¶ 6; however, it has provided no alternative definition or explanation of its differences with the common understanding.

("APR") of 5.98 percent. To participate in this "Line of Credit" Appellant also charged consumers a "monthly participation fee" of $149.95. This fee was charged each month as long as the consumer had any outstanding principal, fees, and finance charges. Appellant operated this program without the partnership of any bank and without obtaining a license from the Secretary of Banking pursuant to Section 3 of the Consumer Discount Company Act.[2] *See* 7 P.S. §§ 6201, 6203.

In September 2006, the Department of Banking (the "Department") filed a complaint in the Commonwealth Court seeking declaratory and injunctive relief to prevent Appellant from charging Pennsylvania consumers the monthly participation fees on the basis that they violated the CDCA and the Loan Interest and Protection Law.[3] The complaint alleged that Appellant's line-of-credit product violated Section 3.A of the CDCA, which provides that:

[N]o person shall engage or continue to engage in this Commonwealth, either as principal, employe, agent or broker, in the business of negotiating or making loans or advances of money on credit, in the amount or value of twenty-five thousand dollars ($25,000) or less, and charge, collect, contract for or receive interest, discount, bonus, fees, fines, commissions, charges, or other considerations which aggregate in excess of the interest that the lender would otherwise be permitted by law to charge if not licensed under this act on the amount actually loaned or advanced....

7 P.S. § 6203.A. The Department maintained that, pursuant to Section 201 of the LIPL, 41 P.S. § 201, Appellant was prohibited from charging more than six percent annual interest on its line-of-credit product. The complaint alleged that the monthly participation fee ($149.95) was actually interest on the sum loaned. That fee, together with the line-of-credit interest rate (5.98%), amounted to more than six percent

---

2. Act of April 8, 1937, P.L. 262, *as amended,* 7 P.S. §§ 6201–6219 (the "CDCA").

3. Act of January 30, 1974, P.L. 13, *as amended,* 41 P.S. §§ 101–605 (the "LIPL").

annual interest on the amount advanced; thus, imposition of the fee violated the CDCA and the LIPL.

Appellant filed an answer with new matter denying that its revolving credit product violated the CDCA or the LIPL and averring that, pursuant to a choice-of-law clause contained in the revolving credit agreements, Delaware law governed the legality of its conduct. Arguing that this choice-of-law provision in Appellant's contracts violated Pennsylvania's fundamental public policy against usurious lending, the Department made a motion for judgment on the pleadings. Appellant filed a cross-motion for judgment on the pleadings. Community Legal Services and the Pennsylvania AFL–CIO filed a brief as *amici* on behalf of the Department.

A three-judge panel of the Commonwealth Court granted the Department's motion and issued a permanent injunction preventing Appellant from charging Commonwealth consumers the monthly participation fee. *See Pennsylvania Dep't of Banking v. NCAS of Delaware, LLC,* 931 A.2d 771 (Pa. Cmwlth.2007). On the choice-of-law issue, the court concluded that Pennsylvania law applied because the Department brought the action pursuant its statutory police power. The court acknowledged the parties' arguments favoring application of Section 187 of the Second Restatement of Conflicts of Laws. Since the Department was not a party to any contract with Appellant, however, the court concluded that the terms of Appellant's contracts with Commonwealth consumers were not binding on the Department. The court also explained that, although a consumer's claim against a lender might be subject to the contract's choice-of-law provision, the Department's enforcement action was not subject to the agreement in the present situation where the agency filed an action in its own name to enforce a statutory provision. *See id.* at 778. Further, the court opined that, assuming *arguendo* that the choice-of-law provision applied, Pennsylvania law would nevertheless control. *See id.* at 778 n. 12.

Applying Pennsylvania law, the court found that the 5.98 percent interest aggregated with the monthly fee on Appellant's line-of-credit constituted an interest rate exceeding six

percent in violation of the CDCA. Under Section 3.A of the CDCA, the court observed that the test is whether the interest and any other " 'discount[s], bonus[es], fees, fines, commissions, charges or other considerations,' in the *aggregate*, exceed the six percent [allowable] annual simple interest." *NCAS*, 931 A.2d at 779 (emphasis in original) (quoting 7 P.S. § 6203.A). Using an APR rate calculator, the court determined that the $149.95 monthly participation fee in combination with the 5.98 percent interest rate aggregated into an annual interest rate of approximately 368 percent. The court concluded that Appellant violated the CDCA because it was required to be licensed to charge interest in excess of the six percent rate authorized by Section 201 of the LIPL. *See id.* (citing 41 P.S. § 201). In response to Appellant's argument that the fee should not be considered because it was not charged "on the amount actually loaned" as required by Section 3.A, the court explained that the charge was "inextricably related" to the amount loaned because it was a necessary condition to be fulfilled before Appellant would provide any loan. *Id.*

Finally, in response to the Department's allegation that Appellant had violated the LIPL, the Commonwealth Court determined that there were insufficient facts in the record to decide whether Appellant violated the LIPL. The court observed that Section 201 of the LIPL provides that "the maximum lawful rate of interest for the loan or use of money in an amount of fifty thousand dollars ($50,000) or less in all cases where no express contract shall have been made for a less rate shall be six per cent (6%) per annum." *NCAS*, 931 A.2d at 780 (quoting 41 P.S. § 201). Section 201 only refers to a "lawful rate of interest" not an aggregation of fees and interest as in the CDCA; thus, the court concluded that, without a further development of the record, it could not determine whether the fee constituted disguised interest that would bring the total interest rate over the six percent limit.[4]

4. After filing a notice of appeal, Appellant lodged an emergency application for a stay or supersedeas, which the Commonwealth Court

On appeal to this Court, Appellant argues that the Commonwealth Court erred in holding that Pennsylvania law rather than Delaware law regulates its conduct. Appellant asserts that Section 187 of the Second Restatement of Conflicts of Law sets forth a prudential rule that applies to all controversies, because it protects the interests of both contracting parties and the Commonwealth by requiring application of Pennsylvania law only where Pennsylvania has a materially greater interest in the controversy and a fundamental policy at stake. If it did not, Appellant maintains that private parties and the courts would have no guidance for determining whether and when Pennsylvania statutory law should apply. Appellant also contends that the court erred in concluding that Pennsylvania law would apply in the event Section 187 governed because Appellant had substantial contacts with Delaware, its state of incorporation. Further, Appellant argues that Pennsylvania does not have a fundamental policy prohibiting the fees and interest charged under its Revolving Credit Agreement because there are exceptions to the six percent interest rate within other Pennsylvania statutes.[5]

Appellant next argues that the Commonwealth Court misinterpreted the plain language of the CDCA by determining that the monthly participation fee was within the scope of Section 3.A of that statute. Appellant maintains that the plain language of Section 3.A indicates that it applies only when interest and other charges "on the amount actually loaned or advanced" exceed the interest the lender may otherwise charge. 7 P.S. § 6203.A. Since the fee was a fixed amount levied regardless of the amount that the consumer is loaned or advanced, Appellant contends that it is not subject to aggregation under Section 3.A. Additionally, Appellant highlights

denied. Appellant then filed an emergency application with this Court, which was denied on August 28, 2007.

5. As an example of one such exception, Appellant offers Section 322(d) of the Pennsylvania Banking Code, which authorizes Pennsylvania banks to charge a maximum rate of interest as set by the National Credit Union Administration Board, currently 18 percent APR, plus other "periodic charges." 7 P.S. § 322(d).

that the fee was charged regardless of whether the customer ever "actually" obtained a loan, a fact the Department acknowledged.

Appellant also contends that the Commonwealth Court could not find a CDCA violation where it held that there was insufficient evidence to determine if the LIPL had been violated. According to Appellant, a violation of the LIPL is a necessary condition for determining whether Pennsylvania's usury laws have been breached. Under Appellant's theory, if there is no violation of the six percent interest rate cap in Section 201, 41 P.S. § 201, then a lender need not turn to the CDCA exception permitting a higher interest rate if the lender obtains a license. *See* 7 P.S. § 6213.E (authorizing a licensed lender to charge up to 9.5 percent annual simple interest for the first two years in which the contract is repayable).

The Department responds that it cannot be bound by the choice-of-law provision invoked by Appellant, because it is not a contracting party to the credit agreements. Moreover, the Department contends that the contractual choice-of-law provision cannot limit its police power authority to enforce Pennsylvania law, and, alternatively, that Appellant cannot use such a provision to avoid the state's usury laws. *See Carlino v. Whitpain Investors*, 499 Pa. 498, 504, 453 A.2d 1385, 1388 (1982) ("[I]ndividuals cannot, by contract, abridge police powers which protect the general welfare and public interest."). The Department also asserts that Pennsylvania law would apply even under the Second Restatement of Conflicts analysis, because Pennsylvania's prohibition against exploitative lending is a fundamental public policy. According to the express language of Section 187 of the Second Restatement of Conflicts, the Department observes, a fundamental public policy of the forum cannot be contravened by a choice-of-law provision.[6] Additionally, the Department notes that this sec-

6. Section 187 provides in pertinent part:

> (2) The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is

tion has been adopted by Pennsylvania courts. *See Miller v. Allstate Ins. Co.,* 763 A.2d 401, 403 (Pa.Super.2000) (applying Section 187 of the Second Restatement of Conflicts).

The Department asserts that the broad language of the CDCA indicates that the General Assembly intended the statute to have a greater reach than traditional usury statutes in order to prevent unlicensed lenders from making any charges, whatever their specific character or label, that aggregate in excess of six percent annual simple interest. In response to Appellant's argument that the participation fee should not be considered under the CDCA because it is not charged "on the amount actually loaned," the Department contends that, although hypothetically a consumer could pay the fee without actually obtaining a loan, it strains the bounds of reason to conclude that persons whose financial circumstances are such that they would resort to a payday lender would pay $145.95 per month for the supposed convenience of being able to later borrow a maximum of $500, but not actually obtain such a loan.[7] Notably, the terms of Appellant's agreement provided that Appellant would close any line of credit

> one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless ...
>
> * * *
>
> (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.
>
> RESTATEMENT (SECOND) OF CONFLICTS § 187 (2007).

7. The Department relies on the *amici's* description of the circumstances facing payday loan borrowers. The *amici* explain that the typical borrower does not have sufficient funds in his or her bank account to cover the amount of the loan, which is why payment is delayed until the borrower's next payday. *See Amici,* Community Legal Services and The Pennsylvania AFL–CIO, Brief in support of Appellee at 3. Because payday loans are so expensive and have such a short repayment period, the *amici* contend that most borrowers cannot afford to pay the loans back in full with interest and must renew their loan, often characterized as obtaining a "new" loan, by paying another fee to extend the due date until their next payday. *See id.* at 4. This leads to a cycle of indebtedness that, according to the *amici,* is a major source of revenue for the payday loan industry, including Appellant, which provided an average of eight payday loans per customer in 2005. *See id.* at 5.

account that had no principal balance for one monthly billing cycle. *See* NCAS Revolving Credit Agreement, R.R. at 182a–183a. Accordingly, the Department asserts that, even drawing reasonable factual inferences in Appellant's favor, the unavoidable conclusion is that the fee was charged on the actual loans advanced, in violation of the CDCA. Moreover, both the Department and the *amici* observe that Appellant's interpretation would inhibit the CDCA from serving its purpose, to prevent exploitative lending.[8]

Finally, responsive to Appellant's argument that a lender cannot violate the CDCA without actually violating the LIPL, the Department contends that the LIPL and the CDCA by their plain terms have different scopes. The LIPL sets "the maximum lawful rate of interest" that may be charged in Pennsylvania at six percent annual simple interest, 41 P.S. § 201, whereas the CDCA caps not only "interest" but also the amount of "discount, bonus, fees, fines, commissions, charges, or other considerations" that a non-bank lender may charge without a license at the equivalent six percent annual simple interest. 7 P.S. § 6203.A. The CDCA, therefore, regulates costs associated with a loan more broadly than does the LIPL. Accordingly, the Department concludes that one may violate the CDCA without violating the LIPL.

Our review of the Commonwealth Court's decision granting the Department's motion for judgment on the pleadings is limited to whether the court committed an error of law or whether unresolved questions of material fact remained. *See Travelers Cas. & Sur. Co. v. Castegnaro,* 565 Pa. 246, 250, 772 A.2d 456, 459 (2001). In reviewing a grant of judgment on the pleadings this Court regards all of the non-moving party's well-pleaded allegations as true, and may consider against that

**8.** To this end, both the Department and the *amici* note that under Appellant's interpretation of the CDCA unlicensed lenders, like Appellant, would be permitted to charge exorbitant fees, while at the same time lenders licensed under the CDCA are limited to charges of $50 annually. *See* 7 P.S. § 6217.1.D. The Department and the *amici* reason that lenders would have no incentive to obtain a license in order to charge higher interest rates, because they could capture that increase by charging high fees, thus rendering the statute useless at protecting the public against usury.

party only those allegations that it has admitted. *See Eme-rich v. Philadelphia Ctr. For Human Dev. Inc.,* 554 Pa. 209, 213 n. 1, 720 A.2d 1032, 1034 n. 1 (1998). Since the Common-wealth Court's decision embodies conclusions of law, our scope of review is plenary. *See Lindstrom v. City of Corry,* 563 Pa. 579, 583, 763 A.2d 394, 396 (2000).

It is well established that Commonwealth public policy prohibits usurious lending, a prohibition that has been recog-nized for well over 100 years. *See Earnest v. Hoskins,* 100 Pa. 551, 559 (1882); *see also Richman v. Watkins,* 376 Pa. 510, 515, 103 A.2d 688, 691 (1954); *Gilbert v. Otterson,* 379 Pa.Su-per. 481, 486, 550 A.2d 550, 553 (1988). In *Equitable Credit & Discount Co. v. Geier,* 342 Pa. 445, 455, 21 A.2d 53, 58 (1941), in rejecting a constitutional challenge to the CDCA, this Court recognized that:

> If there is anything well established in constitutional law it is that regulation of the rate of interest is a subject within the police power of the State, and this is especially true in the case of loans of comparatively small amounts, since the business of making such loans profoundly affects the social life of the community.

*Id.* at 455, 21 A.2d at 58.

■ Here, it is not legitimately disputed that the Depart-ment instituted this action pursuant to its police power, not only to protect consumers who had already entered into contracts with Appellant, but more broadly on behalf of the general public to enforce the policy protecting them from usurious lending. *See* Complaint, R.R. at 59a (seeking a permanent injunction to prevent Appellant from charging monthly participation fees to Pennsylvania consumers). When viewed in this light, and as the Department forcefully argues, the choice-of-law provision in Appellant's contracts cannot bind the Department in this action to enforce Pennsylvania public policy. *Cf. BankWest, Inc. v. Oxendine,* 266 Ga.App. 771, 598 S.E.2d 343, 347 (2004) ("The parties to a private contract who admittedly make loans to Georgia residents cannot, by virtue of a choice of law provision, exempt them-

selves from investigation for potential violations of Georgia's usury laws.").[9]

Whether ∷Section 3.A regulates only a fee charged "on the amount actually loaned or advanced" is a question of statutory interpretation, the objective of which is to ascertain and effectuate the intent of the General Assembly. *See* 1 Pa.C.S. § 1921(a). In this regard, the plain language of a statute is the foremost indication of legislative intent. *See Tritt v. Cortes*, 578 Pa. 317, 321, 851 A.2d 903, 905 (2004). Section 3.A provides that:

[N]o person shall ... charge, collect, contract for or receive interest, discount, bonus, fees, fines, commissions, charges, or other considerations which aggregate in excess of the interest that the lender would otherwise be permitted by law to charge if not licensed under this act on the amount actually loaned or advanced....

**9.** Moreover, this Court has recognized that choice-of-law agreements can be avoided when the terms offend Commonwealth public policy even in disputes between contracting parties. *See McIlvaine Trucking, Inc. v. W.C.A.B. (States)*, 570 Pa. 662, 672–73, 810 A.2d 1280, 1286 (2002) (holding that the parties' choice-of-law agreement as relating to workers' compensation was appropriately avoided where it offended state public policy as reflected in express provisions of the Pennsylvania Workers' Compensation Act). Pennsylvania courts have consistently held that the prohibition of exploitative lending is a fundamental public policy that cannot be circumvented. *See Richman*, 376 Pa. at 515, 103 A.2d at 691 ("The statute against usury forms a part of the public policy of the state and cannot be evaded by any circumvention or waived by the debtor.").

As noted, Appellants argue that the fact that the Pennsylvania Legislature has enacted various statutes which allow certain financial entities, in certain circumstances, to impose interest rates or other charges in excess of threshold lawful rates demonstrates that there is no fundamental policy prohibiting the fees and interest charged under its agreement. In point of fact, violation of any of these statutory provisions will itself offend the public policy of the Commonwealth, as established by the General Assembly. *See McLaughlin v. Gastrointestinal Specialists, Inc.*, 561 Pa. 307, 315–16, 750 A.2d 283, 288 (2000) (explaining that "we declare the public policy of this Commonwealth by ... looking to our own Constitution, court decisions *and* statutes promulgated by our legislature" (emphasis added)); *See generally* GEORGE J. COUCH, COUCH ON INSURANCE § 101.15 (3d ed. 2000) ("As statutes and regulations are considered articulations of public policy, a violation of a statute or administrative regulation is also a violation of public policy.").

7 P.S. § 6203.A. Appellant maintains that the phrase "on the amount actually loaned or advanced" modifies all prior clauses within the entire sentence, and, thus, to come within the scope of Section 3.A any "charge," "fee," or other enumerated item must be "on the amount actually loaned or advanced." A plain reading of the provision, however, yields a contrary result. In materially distinct clauses, Section 3.A first describes the broad range of subject charges ("No person shall . . . charge, collect, contract for or receive interest, discount, bonus, fees, fines, commissions, charges, or other considerations"), then sets a benchmark against which such charges are to be assessed ("which aggregate in excess of the interest that the lender would otherwise be permitted by law to charge if not licensed under this act on the amount actually loaned or advanced"). 7 P.S. § 6203.A. The proviso "on the amount actually loaned or advanced" attaches quite logically to the noun "interest" as utilized in the benchmark clause; indeed, it is common usage when discussing interest to specify the principal amount upon which it is calculated. Thus, under a straightforward reading of the statute, the broad range of subject charges is not constrained by the proviso upon which Appellant's arguments rely.

 This interpretation is consistent with the last antecedent rule of statutory construction, which advises that a proviso usually is construed to apply only to the provision or clause immediately preceding it. *See McKinley v. PennDOT*, 564 Pa. 565, 578 n. 10, 769 A.2d 1153, 1160 n. 10 (2001).[10] The rule is not absolute, but the United States Supreme Court has noted that it is "quite sensible as a matter of grammar," *Barnhart v. Thomas*, 540 U.S. 20, 26, 124 S.Ct. 376, 381, 157 L.Ed.2d 333 (2003), and the approach generally may be applied in absence of evidence of some contrary purpose. *See generally* 1A N. SINGER, SUTHERLAND ON STATUTORY CONSTRUCTION § 47.22, at 369 (6th rev. ed. 2000).

Here, we can discern no such contrary intent from the statute. Although there is no published legislative history

---

**10.** *See generally Commonwealth v. Williams,* 525 Pa. 216, 579 A.2d 869 (1990) (applying the last antecedent rule to resolve a similar question of statutory interpretation).

pertaining to the CDCA, as this Court previously recognized, the General Assembly was guided by recommendations from the Secretary of Banking's 1937 report on small loan companies and consumer credit made to the House of Representatives. *See Geier,* 342 Pa. at 453, 21 A.2d at 57 (discussing the Department of Banking Report in Pursuance to Resolution No. 180, Session 1936, Study Operation of Small Loan Companies, Appendix to the Legislative Journal, Sessions of 1937, Page 7554 *et seq.* (the "Report")). The Report directed the Legislature to follow two fundamental rules in seeking to provide for adequate consumer credit: "the borrowing public must be protected against extortionate interest charges and the rates allowed must be sufficient to permit the lender to earn a fair return on his invested capital." Report at 7563. Our interpretation harmonizes the remedial purposes of the statute by preventing lenders from charging "extortionate" fees, while at the same time charging a legal interest rate, thus closing a wide loophole for usurious practices.[11]

Additionally, this plain-meaning interpretation is consistent with the substantive position of the administrative agency vested with enforcement responsibility, *see* 7 P.S. § 6212, to which we should accord deference. *See Winslow–Quattlebaum v. Maryland Ins. Group,* 561 Pa. 629, 635, 752 A.2d 878, 881 (2000) ("It is well settled that when the courts of this Commonwealth are faced with interpreting statutory language, they afford great deference to the interpretation ren-

---

11. The *amici* explain that consumer lenders have, since the mid-Nineteenth Century, attempted and succeeded at avoiding usury laws. *See Amici, Community Legal Services and The Pennsylvania AFL–CIO,* Brief in support of Appellee at 7–18. They maintain that Appellant's characterization of the charges as a "participation fee" rather than interest is an example of the industry's latest scheme to avoid usury laws. *Id.* This Court has acknowledged that "usury is generally accompanied by subterfuge and circumvention of one kind or another to present the color of legality." *Richman v. Watkins,* 376 Pa. at 515, 103 A.2d at 691. We agree with the Department, and the *amici* that Appellant's interpretation of the statute would undermine the usury laws' purpose: "to protect the citizenry of this Commonwealth from being exploited at the hands of unscrupulous individuals seeking to circumvent the law at the expense of *unsuspecting* borrowers who may have no other avenue to secure financial backing." *Smith v. Mitchell,* 420 Pa.Super. 137, 143, 616 A.2d 17, 20 (1992) (emphasis in original).

dered by the administrative agency overseeing the implementation of such legislation."). Although the Department has not advanced the specific grammatical approach set forth above, its general descriptions of the overall workings of Section 3.A are entirely consistent with such approach.[12] Moreover, appellate courts are not limited by the specific grounds raised by the appellee or invoked by the court under review, but may affirm for any valid reason. *See American Future Sys., Inc. v. Better Bus. Bureau of Eastern Pennsylvania*, 592 Pa. 66, 86, 923 A.2d 389, 401 (2007).

 We conclude that Section 3.A of the CDCA prohibits unlicensed lenders of under $25,000 from charging interest and any type of other or additional charge or charges that aggregate in excess of six percent, the amount they would otherwise be permitted to charge on a loan under the LIPL. Further, because the CDCA applies the LIPL interest rate to an aggregation of interest and other charges, while the LIPL only refers to interest, we agree with the Department that one may violate the CDCA independent of any LIPL violation.

The fees and interest Appellant charged in relation to its payday loans aggregate in excess of six percent APR; therefore, Appellant violated Section 3.A of the CDCA.

The order of the Commonwealth Court is affirmed.

Chief Justice CASTILLE, Justices EAKIN, BAER, TODD and McCAFFERY join the opinion.

12. For example, the Department explains:

> [T]he CDCA … limits not only the amount of "interest" but also the amount of "discount, bonus, fees, fines, commissions, charges or other considerations" that a non-bank lender may charge without a license. For unlicensed lenders, such as Advance America, such charges, whatever their specific character, may not aggregate in excess of 6% annual simple interest.
>
> * * *
>
> Thus, in practical terms, the only way for a non-bank entity such as Advance America to permissibly charge a borrower "interest, discount, bonus, fees, fines, commissions, charges, or other considerations which aggregate *in excess" of 6% simple interest on unsecured consumer credit of up to $25,000* is by acquiring a license under the CDCA.

Brief of Appellee at 9–10 (emphasis added).