**[J-81-2016][M.O. – Dougherty, J.]**

**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 718 CAP |
| | : | |
| Appellee | : | Appeal from the Judgment of Sentence |
| | : | entered on 1/6/15 in the Court of |
| v. | : | Common Pleas, Monroe County, |
| | : | Criminal Division at No. CP-45-CR- |
| | : | 0000391-2008 |
| CHARLES RAY HICKS, | : | |
| | : | |
| Appellant | : | ARGUED: September 13, 2016 |

***CONCURRING OPINION***

**CHIEF JUSTICE SAYLOR**                    DECIDED: March 28, 2017

I join Parts I, II and IV of the majority opinion and concur in the result relative to the balance.

As to Part III, I agree with Justice Donohue that various majority opinions of this Court, like the decisions of a number of other courts, have incorrectly blended various distinct grounds for relevance associated with proffered, uncharged misconduct. *See* Dissenting Opinion, *slip op.* at 8 (Donohue, J.) (describing a "decades-long misunderstanding about what type of connection is truly required for the purpose of proving a common scheme").[1]  As Justice Donohue also ably explains, either as a

---

[1] *Cf. State v. Griffin*, 887 N.W.2d 257, 268 (Minn. 2016) (Stras, J., concurring) (positing that majority decisions of the Minnesota Supreme Court similarly have conflated the *modus operandi* and common-plan theories of relevance pertaining to other bad acts). *See generally* DAVID P. LEONARD, NEW WIGMORE EVID. OF OTHER MISCONDUCT & SIMILAR (continued…)

consequence or in conjunction, majority opinions of this Court also have substantially diluted the putatively stringent standard associated with at least one of these, namely, proof of identity via a *modus operandi* theory. *See* Dissenting Opinion, *slip op.* at 15.[2] My dissent in *Commonwealth v. Arrington*, 624 Pa. 506, 86 A.3d 831 (2014), reflects my belief that the threshold for the use of uncharged misconduct as evidence of *identity* should remain high, in accordance with the signature-crimes analysis related by Justice Donohue. *See* Dissenting Opinion, *slip op.* at 6-12 (Donohue, J.); *accord Arrington*, 624 Pa. at 555, 86 A.3d at 860-61 (Saylor, J., dissenting).[3]

---

(…continued)
EVENTS §13.5 (2017) [hereinafter, LEONARD, NEW WIGMORE] (explaining the differences between the distinct bases for logical relevance underlying the separate *modus operandi* and common scheme or plan theories); *id.* §9.2 (observing that courts often mix the "common plan or scheme" ground with other admissibility routes); Edward J. Imwinkelried, *The Plan Theory for Admitting Evidence of the Defendant's Uncharged Crimes: A Microcosm of the Flaws in the Uncharged Misconduct Doctrine*, 50 MO. L. REV. 1, 4 (1985) (indicating that courts have often misapplied the common plan theory of relevance and, more broadly, the uncharged misconduct doctrine in general); David P. Leonard, *The Use of Uncharged Misconduct Evidence to Prove Knowledge*, 81 NEB. L. REV. 115, 139 (2002) (opining that "[m]any courts . . . have shown a particularly strong tendency toward poorly reasoned decisions in these cases").

[2] *Cf. Griffin*, 887 N.W.2d at 269 (Stras, J., concurring) (offering a similar observation about the Minnesota experience with the analogue to Pennsylvania Rule of Evidence 404(b)). *See generally* LEONARD, NEW WIGMORE §13.6 ("By slow accretion, . . . misunderstandings can essentially dissolve the already blurry line between the improper character inference and legitimate *modus operandi* reasoning. Proper use of *modus operandi* evidence depends on the fact-finder's willingness to accept the notion that the actor is identified only by conduct that is truly distinctive."); Paul S. Milich, *The Degrading Character Rule in American Criminal Trials*, 47 GA. L. REV. 775, 778 (2013) (expressing the view that "[t]he history of the 'other uses' exception, currently known as Rule 404(b), is one of inexorable expansion, ultimately swallowing all but the remnants of the prohibition against character evidence.").

[3] *See generally* LEONARD, NEW WIGMORE §13.5 ("Because the legitimacy of [the *modus operandi*] theory's application to any given case depends very highly on the similarity of the charged and uncharged conduct, much greater similarity is required if the character (continued…)

I do not view the present matter, however, as one truly implicating an identity-based theory of relevance. In this regard, Appellant's attorney conceded to the jury from the outset of the trial that Appellant was in the victim's company at or around the time that she died and that, in the aftermath, he dismembered her body. See N.T., Nov. 5, 2014, at 61 (reflecting the concession of counsel that Appellant was guilty of abuse of corpse, including the statements that: "I'm going to tell you that Mr. Hicks put the [victim's severed] hands in the wall" and "threw the body parts out of his car"); *id.* at 68 ("I'm letting you know that he dismembered her[.]"). The sole defense was a claim to the possibility of what the defense dubbed as "drug dumping," *i.e.*, that Appellant may have panicked when the victim purportedly died of an accidental drug overdose, and that he therefore decided to covertly dispose of her body. *Id.* Consequently, a main focus at trial was whether various injuries to the victim were pre-mortem or post-mortem (*i.e.*, intentionally inflicted while Deanna Null was alive or incurred incident to the dismemberment and disposal of her body).[4]

---

(…continued)
ban is to be maintained."); Mark Cammack, *Using the Doctrine of Chances to Prove Actus Reus in Child Abuse and Acquaintance Rape: People v. Ewoldt Reconsidered*, 29 U.C. DAVIS. L. REV. 355, 384 (1996) ("Similarities between crimes that are common to many criminals do not support admission under the modus operandi rule because the probability of recurrence is high."); *id.* at 366 ("The greatest degree of similarity is required of evidence offered to prove identity.").

[4] Parenthetically, from my review of the record, Appellant's position that the extensive bruising suffered by the victim occurred after her death seems tenuous. Indeed, the main expert testimony that he offered in support of this point was flatly contradicted by another defense witness, forensic pathologist Isidor Mihalakis, M.D., who strongly agreed with the Commonwealth that the victim died of "[m]ultiple traumatic injuries that resulted in a death." N.T., Nov. 12, 2014, at 76; *see also id.* at 83 ("When you have so much bruising, how can you attribute [the death] to drugs?").

Given this critical aspect of the case, the central relevance at trial of the evidence of Appellant's other assaults upon women went toward negating his defense that the death was an accident. In other words, the evidence was employed by the prosecution primarily to establish the *actus reus* of the murder by corroborating the autopsy report and the testimony for the Commonwealth by a forensic pathologist that the victim's death resulted from "homicidal violence" rather than a mishap. *See* N.T., Nov. 6, 2014, at 14-90 (testimony of Wayne K. Ross, M.D.). This focus clearly enhanced the Commonwealth's claims of relevancy of and necessity for the evidence.[5] Significantly, moreover, the logical relevance of other-bad-acts evidence -- so employed to demonstrate *lack of accident* -- does not depend on as great a degree of similarity, as

---

[5] *Accord Huddleston v. United States*, 485 U.S. 681, 685, 108 S. Ct. 1496, 1499 (1988) (indicating that other bad acts evidence "may be critical to the establishment of the truth as to a disputed issue, especially when that issue involves the actor's state of mind and the only means of ascertaining that mental state is by drawing inferences from conduct"); *United States v. York*, 933 F.2d 1343, 1350 (7th Cir. 1991) ("When the defendant affirmatively denies having the requisite intent by proffering an innocent explanation for his actions, the government is entitled to rebut that argument, 'Evidence of another crime which tends to undermine defendant's innocent explanation for his acts will be admitted.'" (quoting JACK B. WEINSTEIN & MARGARET A. BERGER, WEINSTEIN'S EVIDENCE §404[12] (1990)), *overruled on other grounds Wilson v. Williams*, 182 F.3d 562 (7th Cir. 1999); *Wickizer v. State*, 626 N.E.2d 795, 795 (Ind. 1993) ("The intent exception in Evid. R. 404(b) will be available when a defendant goes beyond merely denying the charged culpability and affirmatively presents a claim of particular contrary intent."); *Wynn v. State*, 718 A.2d 588, 609 (Md. 1998) (Raker, J., dissenting) (collecting cases for the proposition that "[o]ther courts have recognized that once a defendant puts forth a defense premised on an innocent or non-culpable state of mind, evidence of other criminal acts which tends to logically refute the claim of an innocent state of mind on a basis other than criminal propensity attains heightened probative value, and thus becomes admissible."). *See generally* JOHN E.B. MYERS, MYERS ON EVID. INTERPERSONAL VIOLENCE §8.06 (2016) ("Numerous cases approve [the admission of other-misconduct evidence] to rebut a claim of accidental injury." (footnote omitted))

between the charged and uncharged misconduct, as is the case under the *modus operandi* theory.[6]

Along these lines, most jurisdictions recognize the "doctrine of chances" -- also known as the "doctrine of objective improbability" -- as a theory of logical relevance that does not depend on an impermissible inference of bad character, and which is most greatly suited to disproof of accident or mistake. *See, e.g.*, *People v. Spector*, 128 Cal. Rptr. 3d 31, 66–67 (Cal. Ct. App. 2011) ("There is broad consensus that similar acts evidence may be introduced on a doctrine of chances rationale to prove the defendant committed an actus reus when the defendant asserts that he did not cause the . . . harm." (quoting Cammack, *Using the Doctrine of Chances to Prove Actus Reus in Child Abuse and Acquaintance Rape*, 29 U.C. DAVIS L. REV. at 386)). *See generally* LEONARD, NEW WIGMORE §6.3.1 ("The doctrine of chances theory in this context has been embraced by the large number of courts and commentators." (footnotes omitted)); *id.*

---

[6] *See, e.g.*, *State v. Johns*, 725 P.2d 312, 322 (Ore. 1986) (contrasting use of uncharged misconduct to prove identity from admission to prove intent, and explaining that the "rigidity" associated with the necessity to establish striking similarity under *modus operandi* theory "is not required when admitting prior acts to prove intent or lack of mistake"); LEONARD, NEW WIGMORE §7.5.2 (indicating, in the course of a discussion of the "intent" theory of logical relevance -- of which the treatise author considers lack of accident to be a subset -- that "[a]ll agree that charged and uncharged acts need not be as similar to each other as required for the '*modus operandi*' theory'"); Cammack, *Using the Doctrine of Chances to Prove Actus Reus in Child Abuse and Acquaintance Rape*, 29 U.C. DAVIS. L. REV. at 406 ("[T]he alleged conduct need not be unusual so long as the probability of invention is very low, since the probative value of the evidence derives from the improbability of fabricated accusations from diverse sources."); Edward J. Imwinkelried, *The Use of Evidence of an Accused's Uncharged Misconduct to Prove Mens Rea: The Doctrines Which Threaten to Engulf the Character Evidence Prohibition*, 51 OHIO ST. L.J. 575, 589-90 (1990) (indicting that incidents must be "roughly similar" or "fall into the same general category"); *id.* at 596 ("The degree of similarity between the charged and uncharged incidents need not be as great as the degree required when the prosecutor relies on the *modus operandi* theory to prove identity.").

§7.3.2.[7] Application of this principle depends upon "the instinctive logical process that reasonably determines that unusual and abnormal events are unlikely to recur by chance." *People v. Everett*, 250 P.3d 649, 656 (Colo. App. 2010) (citing 2 JOHN WIGMORE, EVIDENCE IN TRIALS AT COMMON LAW §302 (Chadbourn rev. 1979)). *See generally* Edward J. Imwinkelried, *An Evidentiary Paradox: Defending the Character Evidence Prohibition by Upholding a Non-Character Theory of Logical Relevance, The Doctrine of Chances*, 40 U. RICH. L. REV. 419, 439 (2006) (explaining that the doctrine of chances focuses on the objective improbability of coincidence).

As explained by a leading commentator, per the doctrine of chances:

> To determine whether the asserted theory qualifies [as a non-character-based theory of logical relevance], the trial judge must trace the entire chain of inferences underlying the theory. The theory passes muster if the inferential path between the item of evidence and a fact of consequence in the case does not require any inferences as to the defendant's personal, subjective character.
>
> &ast;  &ast;  &ast;
>
> [T]he proponent does not offer the evidence of the uncharged misconduct to establish an intermediate inference as to the defendant's personal, subjective bad character. Rather, the proponent offers the evidence to establish the objective improbability of so many accidents befalling the

---

[7] Although the doctrine of chances can be used to prove *mens rea*, it also may apply to establish *actus reus*, or, as in this case, that the victim died from physical violence as opposed to an accidental drug overdose, as Appellant claimed. *See, e.g.*, *People v. Rath*, 44 P.3d 1033, 1042 (Colo. 2002) ("Other-crimes evidence demonstrating a common design or modus operandi has been admitted in prosecutions for sexual assault not only to prove who committed the crime but also to prove that the alleged sex act actually occurred."). *See generally* Imwinkelried, *The Use of Evidence of an Accused's Uncharged Misconduct*, 51 OHIO ST. L.J. at 586-93; Cammack, *Using the Doctrine of Chances to Prove Actus Reus in Child Abuse and Acquaintance Rape*, 29 U.C. DAVIS. L. REV. at 384-86.

defendant *or the defendant becoming innocently enmeshed in suspicious circumstances so frequently.*

*Id.* at 429, 437 (emphasis added; footnotes omitted); *see also* Cammack, *Using the Doctrine of Chances to Prove Actus Reus in Child Abuse and Acquaintance Rape*, 29 U.C. DAVIS. L. REV. at 378 (explaining, "as in Wigmore's famous example, if a hunter charged with having shot his hunting companion claims that the shooting was accidental, evidence of the defendant's having fired at his companion on other occasions becomes admissible to disprove the claim of accident").[8]

The rationale underlying the doctrine is further developed by another commentator -- and distinguished from character-based reasoning -- as follows:

> The reasoning of the doctrine of chances theory avoids the forbidden character-based logic, and thus is permissible under current law. It is founded on a logical inference deriving not from the personal characteristics of the actor, but from the external circumstances themselves. The inference is based on informal probability reasoning -- reasoning that does not require formal statistical proof, but only the jury's subjective evaluation of likelihood based on intuition and common experience. And in many cases, the intuitive assessment is rather compelling. Could it really be true that a person has received so many stolen vehicles without realizing -- at any point -- that they were stolen? It is

---

[8] *See also* Imwinkelried, *An Evidentiary Paradox*, 40 U. RICH. L. REV. at 461 ("By negatively discrediting the random chance hypothesis, the doctrine affirmatively increased the probability assigned to the hypotheses. Moreover, since the only final conclusion necessarily yielded by the doctrine is that one or some of the incidents are not accidents, logically an assumption of the person's unchanging character cannot be embedded in the doctrine."); Cammack, *Using the Doctrine of Chances to Prove Actus Reus in Child Abuse and Acquaintance Rape*, 29 U.C. DAVIS. L. REV. at 388-89 ("The fact that is being proven, the defendant's commission of the criminal act, is established indirectly through a process of elimination. Once the possibility of accident is rendered unlikely, the most plausible explanation for the harm's occurrence is that the defendant caused it." (footnote omitted)); *id.* at 380 ("The probative value of the similar act evidence in disproving the claim of innocence rests on the improbability of non-recurrent similar events recurring by chance.").

> thus possible for one's mind to travel from the evidence to the conclusion without relying on forbidden character reasoning or on the assumption that prior experience would have given the defendant notice of the stolen nature of vehicles obtained from a particular source or under similar circumstances.

Leonard, *Use of Uncharged Misconduct Evidence*, 81 NEB. L. REV. at 161-62; *see also id.* at 167 (approving doctrine-of-chances reasoning where it "does not involve a judgment about the defendant's moral character, and thus does not require an inference that the defendant acted in accordance with the character trait so revealed").[9]

I realize that the general restriction on employing character-based reasoning to establish guilt is recognized as a hallmark of the American system of justice. *See, e.g.*, Cammack, *Using the Doctrine of Chances to Prove Actus Reus in Child Abuse and Acquaintance Rape*, 29 U.C. DAVIS. L. REV. at 357 (couching the character evidence rule as "a pillar of Anglo-American evidence law"); Benjamin Z. Rice, Comment, *A Voice from People v. Simpson: Reconsidering the Propensity Rule in Spousal Homicide*

---

[9] *See also* Cammack, *Using the Doctrine of Chances to Prove Actus Reus in Child Abuse and Acquaintance Rape*, 29 U.C. DAVIS. L. REV. at 407 n.213 (citing Edward J. Imwinkelried, *A Small Contribution to the Debate Over the Proposed Legislation Abolishing the Character Evidence Prohibition in Sex Offense Prosecutions*, 44 SYRACUSE L. REV. 1125, 1136-37 (1993), for the proposition that "similar accusations evidence invites jurors to focus on objective improbability of repeated accusations rather than the subjective character of the accused"); Leonard, *Use of Uncharged Misconduct Evidence*, 81 NEB. L. REV. at 162 ("Doctrine of chances reasoning does not involve an inference of knowledge on one occasion from proof of knowledge on one or more prior occasions. Rather, each occasion lessens the likelihood of innocent knowledge in each other occasion."); Imwinkelried, *An Evidentiary Paradox*, 40 U. RICH. L. REV. at 439 ("The doctrine does not ask the jurors to utilize the defendant's propensity as the basis for a prediction of conduct on the alleged occasion. Instead, the doctrine asks the jurors to consider the objective improbability of a coincidence in assessing the plausibility of a defendant's claim that a loss was the product of an accident or that he or she was accidentally enmeshed in suspicious circumstances."). *See generally Johns*, 725 P.2d at 322-24 (offering an extensive development of the doctrine of chances, with reference to the teachings of Professors Wigmore and Imwinkelried).

*Cases*, 29 LOY. L.A. L. REV. 939, 945 (1996) (indicating that the prohibition against character evidence originated as a response to inquisitorial practices such as those of the Star Chamber (citation omitted)). Nevertheless, there remains a material difference between the use of evidence to prove "general evil disposition" and advancement to demonstrate "the intention which composes a part of the crime," including a lack of accident or mistake. *Johns*, 725 P.2d at 322 n.2 (quoting *United States v. Burr*, 25 F. Cas. 52, 54 (C.C.D. Va. 1807)).

Hence, I find that the doctrine of chances represents a non-character-based path of logical reasoning that sufficiently comports with the ideals underlying Rule of Evidence 404, as well as its express terms. *See generally* Cammack, *Using the Doctrine of Chances to Prove Actus Reus in Child Abuse and Acquaintance Rape*, 29 U.C. DAVIS. L. REV. at 377 (characterizing the doctrine of chances as an "alternative non-character theory of relevance" that best "captures the court[s'] intuition regarding the significance of similarity when uncharged acts are used to prove actus reus"). That the evidence might also tend to demonstrate bad character is not itself controlling,[10] but

---

[10] *See* Cammack, *Using the Doctrine of Chances to Prove Actus Reus in Child Abuse and Acquaintance Rape*, 29 U.C. DAVIS. L. REV. at 357-58 (explaining that the rule governing character evidence "does not proscribe the admission of evidence of a person's character per se," but rather, "prohibits one use of the evidence," in that the evidence "may not be used to support an inference that because the actor has a particular character trait -- dishonesty, for example -- she acted consistently with that trait -- dishonesty -- on some given occasion"); *id.* at 340 ("The character evidence ban does not preclude the use of such evidence as long as the evidence is being offered for a non-propensity purpose."); *cf. United States v. Sampson*, 980 F.2d 883, 886 (3d Cir. 1992) (noting that the basic rule governing the admissibility of character evidence is inclusive in nature, rather than exclusive); 23 C.J.S. CRIMINAL PROCEDURE AND RIGHTS OF ACCUSED §1125 (2016) (discussing the additional "latitude in admitting other crimes evidence" where "[t]he list of purposes in an inclusionary rule of evidence are only examples of exceptions to the general prohibition").

(continued…)

rather, implicates the additional protective measure prescribed in Rule 404(b) and otherwise. *See* Pa.R.E. 404(b)(2) ("In a criminal case this evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice."). Notably, the defense may also secure limiting and cautionary instructions to guard against impermissible character-based reasoning. *See, e.g.*, *Commonwealth v. Jemison*, 626 Pa. 489, 503, 98 A.3d 1254, 1263 (2014) ("Any possibility of unfair prejudice is greatly mitigated by the use of proper cautionary instructions to the jury, directing them to consider the defendant's prior offense [for a relevant, non-character-based purpose], not as evidence of the defendant's bad character or propensity to commit crime.").

The decision in *Spector*, 128 Cal. Rptr. 3d 31, offers a salient example of the application of the doctrine of chances in the context of a a murder prosecution following the shooting death of a woman. There, the defendant claimed that the victim committed suicide or shot herself accidentally. To disprove these defense theories, per the doctrine of chances, the appellate court sanctioned the admission of evidence that the defendant had committed several previous armed assaults upon women, over a period spanning 28 years, and within a fairly discrete set of circumstances.[11]  *Id.* at 65-68

---

(…continued)

In terms of the inclusive quality of Rule 404(b), I also note that the threshold for relevance under Rule of Evidence 401 is a relatively low one. *See* Pa.R.E. 401 ("Evidence is relevant if . . . it has any tendency to make a fact more or less probable than it would be without the evidence; and . . . the fact is of consequence in determining the action."). *See generally* LEONARD, NEW WIGMORE §7.3.2 ("[B]ecause of the minimal definition of 'relevant evidence' that prevails in modern evidence law, the logic of the doctrine of chances can be applied to a wide variety of situations.").

[11] The particular circumstances involved evidence that "when fueled by alcohol and faced with a lack or loss of control over a woman who was alone with him and in whom he had a romantic or sexual interest,  Spector underwent a sharp mood swing, exhibited (continued…)

("[T]he evidence tended to show, by operation of the doctrine of chances, the unlikelihood that this time it was the woman, not Spector, who reached for a gun.").

In *Johns*, 725 P.2d 312, the Oregon Supreme Court approved the admission of evidence of previous armed assaults in a murder prosecution in which the defendant claimed that his wife's shooting death was an accident. One of those incidents involved a former wife and had occurred six years before the killing. *See id.* at 315; *see also* LEONARD, NEW WIGMORE §7.5.3 (crediting the logic of the *Johns* court, given that the defense had claimed accident, making the necessity for the evidence "more palpable" and admission "considerably easier to justify"). Although the Oregon Supreme Court acknowledged that reasonable minds could differ as to the admissibility of this evidence, it "defer[red] to the veteran trial judge who was better able to decide the evidence's effect on the jury after hearing and observing the many witnesses throughout the lengthy trial." *Johns*, 725 P.2d at 326; *accord Commonwealth v. Hoover*, 630 Pa. 599, 610, 107 A.3d 723, 729 (2014) (stressing the deferential abuse-of-discretion standard applied by appellate courts on review of trial-court evidentiary rulings, per which such determinations cannot be disturbed "'merely because an appellate court might have reached a different conclusion, but [reversal] requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous,'" or a demonstration that "the law is either overridden or misapplied" (citations omitted)).

And in *Douglas v. People*, 969 P.2d 1201 (Colo. 1998), the Colorado Supreme Court sanctioned the admission of evidence that a defendant had previously threatened his girlfriend and a neighbor with firearms, in a case in which he had been charged with

_____

(…continued)
extreme anger, and threatened the woman with a gun when she refused to do his bidding." *Spector*, 128 Cal. Rptr. 3d at 73.

menacing with a firearm and claimed self defense. *See id.* at 1206;[12] *see also People v. Kelly*, ___ N.W.2d ___, ___ & n.4, 2016 WL 5329749, n.4 (Mich. Ct. App. Sep. 22, 2016) (*per curiam*) (finding that a trial court had abused its discretion by excluding proposed testimony, in a sexual assault case in which the defense claimed consent, concerning seven prior assault cases occurring over 25 years on the theory that, "employing the doctrine of chances, it strikes us as extraordinarily improbable that eight unrelated women in four different states would fabricate reports of sexual assaults after engaging in consensual sex with defendant"). *See generally* Marjorie A. Shields, *Application of "Doctrine of Chances" in Homicide, Sexual Crimes, and other Offenses Against the Person*, 11 A.L.R. 7th Art. 1 (2015) ("The doctrine of chances has been used to determine that admissibility of evidence of extrinsic acts to prove intent, knowledge, or absence of mistake or accident in homicide, sexual crimes, and other crimes against the person. In other words, the more often the defendant commits the actus reus, the less is the likelihood that the defendant acted accidentally or innocently.").

There is no question that the doctrine of chances must be applied with substantial caution, given the potential to associate the rationale with a propensity-based inference. *See, e.g.*, LEONARD, NEW WIGMORE §7.3.2 (explaining, with reference to an example of the doctrine's application, that, "[t]hough this is close to the forbidden character-based reasoning, it does not cross the line" (footnote omitted)).[13] One court summarized this cautionary advice, and associated safeguards, as follows:

---

[12] Significantly, the court also observed that "[h]ad Douglas not asserted his claims of self-defense, there may not have been any logical relevance independent of showing his bad character as prohibited by CRE 404(b)." *Douglas*, 969 P.2d at 1206.

[13] *Accord* MYERS ON EVID. INTERPERSONAL VIOLENCE §8.06 (noting the closeness between a strain of non-character-based logic and propensity-based reasoning, while (continued…)

> At least one commentator, Professor Edward Imwinkelried, urges courts to be cautious when deciding whether to allow the prosecution to introduce evidence of other acts and rely on the doctrine of chances to prove the actus reus. This is so because "[i]f uncharged misconduct becomes routinely admissible to prove the actus reus, there will be little left to the prohibition" that such evidence cannot be used to prove that a defendant acted in conformity with his or her character.
>
> To protect against the exception swallowing the rule, Professor Imwinkelried recommends that the trial court determine whether the prosecution has satisfied three criteria. First, is the evidence of other acts roughly similar to the charged crime? Second, does the number of unusual occurrences in which the defendant has been involved exceed the frequency rate for the general population? Third, is there a real dispute between the prosecution and the defense over whether the actus reus occurred?

*People v. Everett*, 250 P.3d 649, 658 (Colo. App. 2010) (quoting and citing Imwinkelried, *The Use of Evidence of an Accused's Uncharged Misconduct*, 51 Ohio St. L.J. at 589-93) (internal citations omitted).

In the present case, as previously discussed, the defense at Appellant's trial disputed the *actus reus* of the murder and affirmatively claimed accident. In response, the prosecution sought to admit multiple instances in which Appellant had previously attacked women in circumstances bearing a degree of commonality. *See* Majority Opinion, *slip op.* at 21. Although I respectfully but greatly disagree with the majority's depiction of these incidents as "strikingly similar" to the killing of Ms. Null, or as

(…continued)
concluding that "[s]ince the prevailing view is logically defensible, the theory survives," and "[d]efendant's remedy is to request a limiting instruction cautioning the jury not to use the evidence as proof of bad character" and to "argue that the probative value of the evidence is substantially outweighed by the danger of jury confusion and unfair prejudice").

reflecting a "virtual signature," *id.* at 21-22, I do find them to be "roughly similar" and as substantially "fall[ing] into the same general category," Imwinkelreid, *The Use of Evidence of an Accused's Uncharged Misconduct to Prove Mens Rea*, 51 OHIO ST. L.J. at 589-90, along the lines of the *Spector* and *Johns* cases. *See generally* Leonard, *Use of Uncharged Misconduct Evidence*, 81 NEB. L. REV. at 163 ("One advantage of the doctrine of chances theory is that it does not apply only to cases in which there is remarkable similarity between the uncharged and the charged acts."); *see also supra* note 6. Moreover, I conclude that there were a sufficient number of incidents to dispel the appearance of coincidence, making it less likely that accident accounted for Appellant's undisputed involvement in the chain of circumstances giving rise to his being held to account for murder. *See supra* notes 8-9 and accompanying text.

Notably, although the prosecution did not raise the doctrine of chances by name, it did observe that "the need for the other crimes evidence is high in that the case against the defendant is primarily based on circumstantial evidence *and the defendant has already placed [in] issue the precise cause and manner of the victim's death.*" Offers of Proof dated Apr. 27, 2011, in *Commonwealth v. Hicks*, No. 391-2008 (C.P. Monroe), at ¶15 (emphasis added).[14] *See generally* KENNETH W. GRAHAM, JR., 22B FED. PRAC. & PROC. EVID. §5247 (1st ed. 2016) ("[E]ven in cases where mistake or accident seems unlikely, the defense can raise such a claim and open the door to rebuttal by other crimes evidence."). To the degree that the Commonwealth's focus is viewed as distinct, an appellate court has the ability to affirm a valid verdict for any reason

---

[14] *See generally* Leonard, *Use of Uncharged Misconduct Evidence*, 81 NEB. L. REV. at 160 (observing that doctrine-of-chance logic is "not always labeled as such"); *id.* at 164 ("Courts often employ doctrine of chances reasoning without labeling it as such, suggesting that the theory is probably far more ubiquitous in the cases than might first appear.").

appearing as of record. *See, e.g.*, *Pa. Dep't of Banking v. NCAS of Del., LLC*, 596 Pa. 638, 653, 948 A.2d 752, 761–62 (2008).

Here, Appellant's history of violent attacks upon women certainly reduced the probability that, having been found to be closely associated with a badly bruised body of a woman whom the Commonwealth contended had been choked, there is an innocent explanation for his involvement prior to his admitted dismemberment of the body. Although I agree with the courts and commentators that the distinction between this line of reasoning and an impermissible propensity-based inference may be modest, I believe that it is enough to satisfy that logical non-character-based relevance criterion and to maintain the essential guard against inquisitorial-style determinations of guilt by character.[15]

That said, I reiterate that Rule 404(b) requires trial courts to determine "if the probative value of the evidence outweighs its potential for unfair prejudice." Pa.R.E. 404(b)(2). In this respect, I maintain concerns about the power of potentially inevitable character inferences associated with other-acts evidence, with requiring defendants to effectively defend mini-trials concerning collateral matters, and about the efficacy of jury instructions in this context.[16] Nevertheless, as I read Appellant's brief, the focus of his

---

[15] *Accord Douglas*, 969 P.2d at 1208 ("[W]hile [Rule 404] is designed to protect parties, especially criminal defendants, from the human tendency to permit notions of bad character to carry the day, at the same time, it recognizes that the difficult task of fact-finding is better facilitated when, if not unduly prejudicial, relevant evidence is admitted." (citing J.W. STRONG, MCCORMICK ON EVIDENCE §190 (4th ed. 1992)); Cammack, *Using the Doctrine of Chances to Prove Actus Reus in Child Abuse and Acquaintance Rape*, 29 U.C. DAVIS. L. REV. at 411 n.225 ("The doctrine of chances focuses attention on the improbability of repeated false accusations against the same person, rather than the defendant's subjective character, and therefore minimizes the danger of misuse."); *see also supra* note 13.

[16] *See generally* Milich, *The Degrading Character Rule*, 47 GA. L. REV. at 789 (positing that "the typical limiting instruction offers nothing more than a confusing distinction (continued…)

argument is upon the position that a high degree of similarity is required to establish relevance not only under *modus operandi* theory, but also to demonstrate lack of accident.[17]   Accordingly, from my point of view, my difference with such position is enough to conclude my review of the present appeal.[18]

Finally, I appreciate that the judicial treatment of the admission of evidence of uncharged misconduct in criminal cases has been the subject of intense and sustained critical commentary.  *See, e.g.*, Milich, *The Degrading Character Rule*, 47 GA. L. REV. at 776 ("Many cases and scholarly articles have detailed the convoluted, contradictory, and absurd aspects and applications of the character rule."); *United States v. Davis*, 726

(…continued)
between the proper and improper use of the evidence"); David A. Sonenshein, *The Misuse of Rule 404(b) on the Issue of Intent in the Federal Courts*, 45 CREIGHTON L. REV. 215, 264-67, 270-71 (2011) (discussing social science research concerning juror misuse of evidence of other misconduct and the asserted non-efficacy of limiting and cautionary instructions); Reed, *Admitting the Accused's Criminal History: The Trouble With Rule 404(b)*, 78 TEMP. L. REV. at 243 (indicating that "very few commentators believe that [limiting] instructions really curb the jury's common-sense use of uncharged misconduct").

[17] I recognize that Appellant devotes several pages of his brief to an abstract discussion of Rule 404(b)'s requirement to balance probative value against prejudicial impact.  *See* Brief for Appellant at 8-10.  He does not, however, meaningfully apply that analysis to the circumstances of the case, including the critical reliance by the defense on the suggestion of an accident.  Accordingly, as with the broader themes noted above, I do not consider this aspect to be sufficiently developed for present consideration.

[18] In terms of the presumption of innocence, I observe that the trial court explicitly directed the jury at Appellant's trial to apply such presumption, *see* N.T., Nov. 14, 2014, at 95-96, and again, Appellant does not offer any basis to contest the prevailing assumption that jurors follow the charges from the court.  *See, e.g.*, *Jemison*, 626 Pa. at 503, 98 A.3d at 1263.  Furthermore, I note that some American evidence codes liberally allow for the admission of prior bad acts.  *See, e.g.*, F.R.E. 413(a) (sanctioning the admission, in sexual assault cases, of a broad range of evidence "that the defendant committed any other sexual assault"); *see also* F.R.E. 414(a) (same for child molestation).

F.3d 434, 441 (3d Cir. 2013) (observing that, "[u]ncontroversial at the time of adoption, Rule 404(b) has become the most cited evidentiary rule on appeal" (citing Thomas J. Reed, *Admitting the Accused's Criminal History: The Trouble with Rule 404(b),* 78 TEMP. L.REV. 201, 211 (2005)).  *See generally* 2 JOHN H. WIGMORE, EVIDENCE §302 (Chadbourne rev. 1979) (highlighting, in a survey of cases, "bewildering variances of rulings in the different jurisdictions and even in the same jurisdiction").  It may well be that the interests of justice would be well served were this Court to consider revamping the present approach.  *See, e.g.*, Milich, *The Degrading Character Rule*, 47 GA. L. REV. at 776 (arguing that the "propensity inference is an unreliable proxy for undesirable character evidence, and efforts to faithfully apply the propensity rule often lead to confusion and frustration"); Reed, *Admitting the Accused's Criminal History*, 78 TEMP. L. REV. at 250-53 (reflecting a proposal for change).

Nevertheless, the fact of the matter is that our present rules recognize that many non-character-based theories of logical relevance may generate character-based inferences and depend on case-specific screening for prejudice and jury instructions to guard against impermissible use of other-acts evidence.  Again, I find that it would proceed well beyond the scope of the present appeal, as framed, to delve further into the deeper issues.[19]

---

[19] Certainly, I support the approach of other courts to sharpen the admissibility calculus within the presently prevailing framework.  *See, e.g.*, *United States v. Gomez*, 763 F.3d 845, 855 (7th Cir. 2014) (establishing a protocol for the admission of evidence of uncharged misconduct, requiring, *inter alia*, that the proponent of the other-act evidence should address the supporting chain of logical relevancy specifically and directly, "without the straightjacket of an artificial checklist"); *Davis*, 726 F.3d at 442 (requiring detailed, focused, on-the-record reasoning to support the admission of evidence of other bad acts, while stressing that "a mere recitation of the purposes in Rule 404(b)(2) is insufficient"); *United States v. Morley*, 199 F.3d 129, 137 (3d Cir. 1999) ("Neither a trial court nor an appellate court is comforted when a proponent attempts to justify 'bad act' evidence by resorting to a mantra-like recitation of the provisions of Rule 404(b)."); (continued…)

In summary, although I join in the analysis of evidentiary sufficiency and the statutory review of the verdict aptly rendered by the majority, I concur in the result concerning the treatment of the other-acts evidence based upon a different rationale.

---

(…continued)
*Johns*, 725 P.2d at 317-321 (emphasizing the need to isolate the theory of logical relevance appropriate to a particular case, rather than reciting the non-exclusive list of exceptions set forth in Rule 404(b), while contextualizing the case under review as follows: "the logical relevance theory for which the 'prior crime' evidence was offered is restricted to intent," and "[i]t follow that we are not discussing admissibility . . . under any theory of motive, opportunity, preparation, plan, knowledge or identity or any other unlisted theory").

Although certainly such level of precision was in no way observed in the present case, again, this is not a particularized basis on which the appeal has been grounded.